[Crim. No. 43047. Second Dist., Div. Five. Sept. 30, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
KAY MARION BEACH, Defendant and Appellant.

616

**COUNSEL**

Susan L. Wolk, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

RUTBERG, J.*—

STATEMENT OF CASE

In an information filed by the District Attorney's Office of Los Angeles County, appellant was charged with the crime of murder in violation of section 187 of the Penal Code.[1] It was further alleged that she used a firearm within the meaning of sections 12022.5 and 1203.06, subdivision (a)(1). Appellant was tried by a jury and found guilty of involuntary manslaughter in violation of section 192.2, a necessarily included offense as charged in count I of the information. The use allegation within the meaning of sections 12022.5 was found to have been true.

A diagnostic study pursuant to section 1203.03 was ordered. Proceedings were suspended and appellant was granted probation for five years on certain terms and conditions including that she represent to the court within a reasonable amount of time after being released from custody that she has relocated; that she complete 2,500 hours of community service; that she not use, own or possess any dangerous or deadly weapons; and that she obey all laws, orders, rules and regulations of the probation department and the court. This appeal is from a judgment of conviction (order granting probation).

STATEMENT OF FACTS

This case arose out of a tragic set of circumstance resulting in the death of one David Bell. Mr. Bell was killed by a single gunshot wound to the head from a gun fired by appellant, an elderly widow living at 1410 North McCadden Place, Los Angeles, California. Appellant, who had resided at said address for 24 years prior to the incident, admitted to the shooting, but contended that the homicide was justifiable. There was extensive defense testimony to the effect that in recent years, prior to the date of the shooting, appellant's neighborhood had degenerated due to a spiraling occurrence of burglaries, violence (including shootings), acts of prostitution and a general

---

*Assigned by the Chairperson of the Judicial Council.

[1]All statutory references are to the Penal Code, unless otherwise indicated.

decline in respect for the neighborhood. The neighbors were concerned with abandoned vehicles, the repairing of vehicles in the streets and the littering of the area with debris. Appellant had on several prior occasions conveyed to her neighbors her concerns relating to the deterioration of her neighborhood as well as her personal fears for her own safety and that someone would break into her place as she was alone all the time.[2] Appellant had also earlier complained of several acts of violence against her property. Appellant had installed a high fence around her property approximately 10 years prior to the homicide and kept her front gate padlocked from intruders at all times while not actually using the gate.

In the late morning hours of December 27, 1980, the deceased parked his automobile partially blocking appellant's driveway. Appellant yelled at the victim not to park the car in her driveway but the victim left the car and disappeared. Appellant, angry at this incident and at people generally for continually taking up her driveway space with their cars, smeared some fecal matter on the windshield of the deceased's automobile. The victim returned to his vehicle a few minutes later and observed what had been done to his car windshield. Upon ascertaining from a witness that appellant was the culprit, the victim then scaled appellant's fence and knocked on appellant's door. Not receiving an answer, the victim then proceeded to pick up appellant's garden hose and turn on the water in an apparent attempt to wash his windshield. According to appellant's testimony, she saw a stranger underneath her front window. She became frightened, took her gun, went outside and held it out. The man came toward her "real angry" and called her a "dirty bitch." Appellant became more frightened and she fired the gun. Appellant testified that she didn't mean to shoot the victim, that she held the gun up in the air and shot it thinking that the deceased would see it, hear the shot, would see that she was armed and become frightened. After the gun fired, the victim fell and appellant thought that he had just fainted because she didn't think she had shot him. Shortly thereafter, appellant took a bus to a friend's house through whom arrangements were made for her arrest by the police at a designated location.

## APPELLANT'S CONTENTIONS

Appellant contends on appeal that:

1. "Banishment" as a condition of probation is unconstitutional.

2. The imposition of 2,500 hours of community service as a condition of probation was unjustly harsh and invites a violation of probation.

---

[2]At the time of the incident, an 89-year-old male boarder shared appellant's house.

3. There were multiple errors in the instructions to the jury.

4. There was a denial of the right to cross-examine and appellant was precluded from making objections.

5. The prosecutor committed misconduct during final argument.

We agree with appellant that "banishment" as a condition of probation in this particular case was unconstitutional. As to appellant's remaining contentions, we find that they are without merit.

### BANISHMENT AS A CONDITION OF PROBATION WAS INVALID

■■■ Although the trial court judge's good intentions cannot be questioned, his order that defendant relocate herself from the community where she has lived in her own home for 24 years was unreasonable and unconstitutional. The trial court judge in making this order was not only concerned with a possible repetition by defendant of future acts of violence in her neighborhood, but also for appellant's personal safety because she may well now be considered a "marked woman" in her community. The trial court judge made it clear that appellant was not required to sell the property; that she could retain title to same and rent it out.

■■■ While the court does have broad discretion to impose probation conditions which foster rehabilitation and protect the public, this discretion must be exercised in a reasonable manner and is limited by certain constitutional safeguards. (See Pen. Code, § 1203.1; *People* v. *Lent* (1975) 15 Cal.3d 481, 486 [124 Cal.Rptr. 905, 541 P.2d 545]; *In re White* (1979) 97 Cal.App.3d 141, 145 [158 Cal.Rptr. 562]; *People* v. *Dominguez* (1967) 256 Cal.App.2d 623, 626 [64 Cal.Rptr. 290].)[3] "The discretion granted is not boundless. In the first place, the authority is wholly statutory; the statute [Pen. Code, § 1203.1] furnishes and limits the measure of authority which the court may thus exercise [citations]." (*People* v. *Keller* (1978) 76 Cal.App.3d 827, 832 [143 Cal.Rptr. 184].)

In *In re White, supra,* 97 Cal.App.3d 141, the defendant was convicted of prostitution. As a condition of probation she was provided with a map and was prohibited by the court from being in a specified area of Fresno,

---

[3]Penal Code section 1203.1 provides in pertinent part as follows: "The court may impose and require any or all of the above-mentioned terms of imprisonment, fine and conditions and other reasonable conditions as it may determine are fitting and proper to the end that justice may be done, that amends may be made to society for the breach of the law, for any injury done to any person resulting from such breach and generally and specifically for the reformation and rehabilitation of the probationer, . . ."

California, at any time of day or night. The court concluded that this condition, even though it may have some relationship to the crime of soliciting, was unreasonable because it was too broad. There were enumerable situations in which the probationer could be in the restricted area which would be totally unrelated to the crime charged or any other crime and technically she would still be in violation of this condition of probation.[4] The court went on to explain that keeping White out of the mapped area would have a minimal effect on future criminal conduct except possibly in that particular area.

■ "[A] reasonable condition of probation is not only fit and appropriate to the end in view but it must be a *reasonable* means to that end. Reasonable means are moderate, not excessive, not extreme, not demanding too much, well-balanced. (Webster's Third New Internat. Dict., p. 1892; Black's Law Dict., p. 1431.)" (*People* v. *Keller, supra,* 76 Cal.App.3d 827, 840; italics in original.)

■ The probation condition in this case was unreasonably broad in light of the desired goal. Appellant had lived in her neighborhood for many years and was not involved in any prior violent conduct resulting in the filing of criminal charges.[5] Her physical presence in the neighborhood, for the most part, had been peaceful and law abiding. Keeping appellant out of her home and neighborhood would not necessarily prevent future criminal conduct of a similar nature except perhaps in her own particular neighborhood. No one could predict where appellant might relocate under the court order. It may well be to a similar environment.[6] Taking appellant away from her established home, the companionship of her neighbors, and the familiarity of her surroundings would not contribute to the inner feelings of physical security which appellant apparently so desperately needs, and may very well heighten her feelings of insecurity.

■ "[T]he discretion to impose conditions of probation as granted by Penal Code section 1203.1 is further circumscribed by constitutional safeguards. Human liberty is involved. A probationer has the right to enjoy a significant degree of privacy, or liberty, under the Fourth, Fifth and Fourteenth Amendments to the federal Constitution [citations]." (*People* v. *Keller, supra,* 76 Cal.App.3d 827, 832.)

---

[4]I.e., being a mere passenger in a bus or taxicab which traveled through the designated geographical area.

[5]The record discloses a prior incident reported to the police wherein applicant purportedly fired a gun in the air after a boy on a bicycle had driven past her. No criminal charges were filed.

[6]Appellant, living on a modest fixed income, might very well end up living in another crime ridden area.

A citizen has a basic constitutional right to intrastate as well as interstate travel. (*In re White, supra,* 97 Cal.App.3d 141, 148.) Many other fundamental rights such as free speech, free assembly and free association are often tied in with the right to travel. (See *Kent* v. *Dulles* (1958) 357 U.S. 116, 126 [2 L.Ed.2d 1204, 1210, 78 S.Ct. 1113].) The right to acquire, own, enjoy and dispose of property is also a basic fundamental right guaranteed by the Fourteenth Amendment to the United States Constitution. (See 5 Witkin, Summary of Cal. Law (8th ed. 1974) Constitutional Law, § 273, p. 3563.) Intrinsic and integral to this right is the basic ability to *possess* one's own property. Could it be rationally argued that the enjoyment of the fruits of property ownership does not directly depend upon the owner's free and unimpaired *access to,* and *possession of,* said property?

However, these fundamental constitutional rights are not absolute and may be reasonably restricted in the public interest. Constitutional intrusions have been upheld to the extent that they are required by legitimate governmental demands. (See *People* v. *Arvanites* (1971) 17 Cal.App.3d 1052, 1063 [95 Cal.Rptr. 493] [upholding a probation condition prohibiting engaging in demonstrations]; see also *United States* v. *Consuelo-Gonzalez* (9th Cir. 1975) 521 F.2d 259, 263-265; *In re Mannino* (1971) 14 Cal.App.3d 953, 966-967 [92 Cal.Rptr. 880, 45 A.L.R.3d 996].)

The courts have analogized the criteria for valid infringements on First Amendment rights to those that are applied when a publicly conferred benefit is conditioned on a waiver of constitutional rights:

1. Does the condition reasonably relate to the intended purpose of the legislation conferring the benefit?

2. Does the value to the public of the imposition of this condition manifestly outweigh any impairment of constitutional rights?

3. Are there any alternative means less subversive of the constitutional right, narrowly drawn so as to correlate more closely with the purposes contemplated by conferring the benefit? (*In re White, supra,* 97 Cal.App.3d 141, 150.)

The condition of probation now under review is not necessarily rehabilitative within the purview of section 1203.1. The psychological stress attendant to removing an elderly woman from her home of 24 years could be traumatic.[7] The court in *People* v. *Blakeman* (1959) 170 Cal.App.2d

---

[7]Dr. Michael Maloney, a licensed psychologist who had examined the defendant, testified that she was suffering from organic brain syndrome (senility) and that any change in her family routine could accelerate that deterioration.

596, 597-598 [170 Cal.Rptr. 596; 339 P.2d 202] specifically rejected the prosecutor's argument that banishment was a valid condition of probation because it would contribute to defendant's rehabilitation and remove any temptation to become involved in crime.

Furthermore, the value to the public does not manifestly outweigh any impairment of appellant's constitutional rights of freedom of travel, speech, association, assembly and to the possession and enjoyment of her property. Simply causing appellant to move from one geographical area to another is of minimal value to the public when compared with the infringement of appellant's basic constitutional rights.

Lastly, there were in fact other means that the court did utilize that were less subversive to appellant's constitutional rights and still comported with the purposes intended by the grant of probation. Not possessing dangerous weapons, involvement in a program of psychological and psychiatric counseling, and keeping appellant busy with extensive community work in an area compatible with her hobby of gardening, were all court imposed conditions of probation aimed at appellant's rehabilitation and far less intrusive of her constitutional rights.

## THE CONDITION OF COMMUNITY SERVICE WAS VALID

■ Probation is not a matter of right but an act of clemency, the granting and revocation of which are within the sound discretion of the trial judge. The trial court has broad discretion in imposing terms and conditions of probation. (See *In re Bushman* (1970) 1 Cal.3d 767, 776 [83 Cal.Rptr. 375, 463 P.2d 727]; *People* v. *Osslo* (1958) 50 Cal.2d 75, 103 [323 P.2d 397]; *People* v. *King* (1968) 267 Cal.App.2d 814, 822-823 [73 Cal.Rptr. 440].) ■ The record is clear that the trial court judge carefully reviewed the probation and sentencing report. Appellant had been, with the exception of an elderly boarder, living alone in what she perceived to be a very dangerous and violent community. She was thus left to deal with her own fears by herself. Apparently, the trial court felt that it would be helpful to appellant if she kept herself busy doing community service in an area which she enjoyed, such as gardening. In that way, her energies could be channeled in a more productive and joyful experience, thereby freeing her mind from her fear of the neighborhood in which she resided. The sentencing judge noted that she could work out the hours consistent with her needs and her schedule. This condition of probation was entirely reasonable and within the sound discretion of the trial judge, in light of appellant's physical surroundings and her state of mind.

If it develops down the road that appellant cannot comply with this condition because of her health or other reasons, the condition may be modified

or eliminated in the discretion of the trial court judge. Appellant's argument that the trial judge may not then be available is not persuasive. The unavailability of the trial judge at a possible future probation hearing is an eventuality that faces every probationer in every criminal case. Appellant is not entitled to a guarantee that the same judge who sentenced her will also preside over some possible future probation violation hearing.

## JURY INSTRUCTIONS

Appellant argues that the jury was improperly instructed and raises certain arguments in that regard, namely, that interlineations by the court were not effective in restraining the jurors from perceiving that which should be disregarded; that the court should not have instructed on the lesser included offense of involuntary manslaughter; that the jury should have been instructed as to an alleged lesser included offense of brandishing a weapon; that the trial court modified certain instructions without consulting counsel; and that the court erred in failing to instruct as to the intent necessary for involuntary manslaughter.

For the reasons discussed below, we conclude that error was not committed.

### A. INTERLINEATIONS ON JURY INSTRUCTIONS

 Some of the jury instructions were modified by a very thin line drawn through those portions which were not applicable. The trial judge read the instructions as modified and gave the instructions themselves to the jury during deliberations. Appellant argues that the jury could still read the portions lined out. The jury was specifically instructed that they were not to consider any deleted part of any of the instructions given to them.[8]

 It must be presumed that the jurors followed the instructions of the trial court. (See *People* v. *Chavez* (1958) 50 Cal.2d 778, 790 [329 P.2d

---

[8]The jury instructions given pursuant to CALJIC No. 17.45 are as follows:
"The written instructions now being given will be made available in the jury room during your deliberations. They must not be defaced in any way.
"You will find that the instructions may be either printed, typewritten or handwritten. Some of the printed or typewritten instructions may be modified by typing or handwriting. Blanks in the printed instructions may be filled in by typing or handwriting. Also, portions of printed or typewritten instructions may have been deleted by lining out.
"You are not to be concerned with the reasons for any modifications that have been made. Also, you must disregard any deleted part of an instruction and not speculate either what it was or what is the reason for its deletion.
"Every part of an instruction whether it is printed, typed or handwritten is of equal importance. You are to be governed only by the instruction in its final wording whether printed, typed or handwritten."

907]; *People* v. *Ricketts* (1970) 7 Cal.App.3d 441, 446 [86 Cal.Rptr. 467]; *People* v. *Jones* (1970) 7 Cal.App.3d 358, 364 [86 Cal.Rptr. 516].) In the absence of evidence to the contrary, the presumption will control.

■ Although we do not find reversible error, it is better practice to completely obliterate those portions of the instructions which are to be omitted.

## B. Modification of Instructions Without Consulting Counsel

■ Appellant contends that the handwritten modifications to CALJIC Nos. 2.09, 2.13, 2.01, 2.02 were not presented to counsel prior to the reading of the particular instructions. This contention is not supported by the record. The trial judge noted in discussing the instructions on the record with counsel that he had already had an informal discussion with counsel earlier about the necessary jury instructions. It would be logical to assume that if these modifications were discussed off the record at an earlier time, they would not then again be included in the later discussion on the record. In defendant's motion for a new trial pertaining to the jury instructions, counsel never argued that he didn't see these modifications before they went to the jury. It must be presumed that the trial judge acted according to law in presenting the modified instructions to counsel first before showing them to the jury. (See Evid. Code, § 664; *Ross* v. *Superior Court* (1977) 19 Cal.3d 899, 913 [141 Cal.Rptr. 133, 569 P.2d 727].) There is no evidence in the record to rebut that presumption.

## C. Instructions on Lesser Included Offense of Involuntary Manslaughter

■ Appellant contends that she had a right, as a matter of tactics, to refuse the lesser included offense of involuntary manslaughter. We do not agree with appellant's contention. The courts of this state have held that a trial judge must instruct on lesser included offenses raised by the evidence even if there is no request by defense counsel, or even if there is an objection by counsel. (See *People* v. *Sedeno* (1974) 10 Cal.3d 703, 715-716 [112 Cal.Rptr. 1, 518 P.2d 913], disapproved on another point in *People* v. *Flannel* (1979) 25 Cal.3d 668, 684-685, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1]; *People* v. *Smith* (1978) 78 Cal.App.3d 698, 709 [144 Cal.Rptr. 330].) We note, however, that "[f]ailure to give such an instruction over objection does not require reversal . . . since the error is invited." (*People* v. *Sedeno, supra,* 10 Cal.3d 703, 716, fn. 6.)

## D. Brandishing a Weapon in Violation of Section 417 of the Penal Code

Appellant next urges that the crime of brandishing a weapon in violation of section 417 should have been the basis of a lesser included offense instruction. We do not agree with this contention.

"Generally, two tests are used to determine whether in a particular case a crime is a necessarily and lesser included offense of another crime. The first test looks to the elements of the crime: if, as a matter of legal definition, the greater offense cannot be committed without concomitantly satisfying the elements of the lesser offense, the latter offense is a necessarily lesser included offense. Secondly, a crime is a necessarily lesser included offense if it is within the offense specifically charged in the accusatory pleading." (*People* v. *Barrick* (1982) 33 Cal.3d 115, 133 [187 Cal.Rptr. 716, 654 P.2d 1243].) Brandishing a weapon in violation of Penal Code section 417 would not be a lesser included offense of murder under either test. Murder could be committed in several ways other than by means of a firearm, and section 417 is not within said offense as specifically charged in the accusatory pleading. Similarly, section 417 is not a lesser included offense of assault with a deadly weapon or assault with intent to commit murder. (See *People* v. *Orr* (1974) 43 Cal.App.3d 666, 673 [117 Cal.Rptr. 738]; *People* v. *Birch* (1969) 3 Cal.App.3d 167, 176 [83 Cal.Rptr. 98].) Although the information specifically alleges the use of a firearm, the California Supreme Court has recently held that an allegation of firearm use under section 12022.5 should not be considered in determining lesser included offenses. (*People* v. *Wolcott* (1983) 34 Cal.3d 92 [192 Cal.Rptr. 748, 665 P.2d 520].) Even if the enhancement were considered part of the accusatory pleading, that would still not help appellant. A person could commit a murder using a firearm even though the perpetrator did not draw the weapon in a rude, angry or threatening manner and the gun was not used in a fight or quarrel, but rather it was used, as suggested by respondent, in an ambush where the victim was helpless or unaware. Therefore, Penal Code section 417 is not a necessarily included offense of murder, with or without the special use allegation.

## E. Failure to Instruct as to General Intent (CALJIC No. 3.30)

Appellant urges that the trial court failed to instruct the jury as to the intent necessary to find her guilty of involuntary manslaughter (CALJIC No. 3.30).[9] While it is true that in a criminal case the trial judge must

---

[9]CALJIC No. 3.30 provides: "In the crime[s] charged in Count[s] . . . of the information, . . . there must exist a union or joint operation of act or conduct and general criminal intent. To constitute general criminal intent it is not necessary that there should exist an intent to violate the law. When a person intentionally does that which the law declares to be a crime, he is acting with general criminal intent, even though he may not know that his act or conduct is unlawful."

instruct on the general principles of law relevant to the issues raised by the evidence, the failure in this case, to instruct on the issue of general intent necessary to find defendant guilty of involuntary manslaughter was harmless error. (See *People* v. *Sedeno, supra,* 10 Cal.3d 703, 721; *People* v. *Norton* (1978) 80 Cal.App.3d Supp. 14, 26 [146 Cal.Rptr. 343]; *People* v. *Allen* (1978) 76 Cal.App.3d 748, 751-752 [143 Cal.Rptr. 164].) There was no dispute in the evidence that appellant took the gun outside and intentionally fired the weapon. Appellant herself admitted that she took the gun outside, held it up, and fired it out of fear. The basic issue was whether or not she did so justifiably, in self-defense, or whether the homicide was unlawful. If the jury found that appellant had in fact exhibited the weapon in a rude, angry or threatening manner, that the victim died thereby, and that the killing was not justifiable, then that is the only mental state necessary for involuntary manslaughter. (See *People* v. *Piorkowski* (1974) 41 Cal.App.3d 324, 332, fn. 8 [115 Cal.Rptr. 830].) While CALJIC No. 3.30 should have been given, based on the state of the evidence, the failure to do so was harmless error and appellant could not have been prejudiced.

### CROSS-EXAMINATION

Appellant's contention that she was denied the right to cross-examine and was precluded from making objections cannot be sustained. Appellant argues that she was precluded from cross-examining the police officer as to circumstances surrounding her arrest as well as her purported signature on a written consent to search her home after the arrest. Although this was true, defendant was not prejudiced since the trial court did allow much of this evidence to be presented in the defendant's case-in-chief. The investigating officer was called to the stand by the defendant and the court allowed appellant to go into great detail about the facts concerning the arrest, the anonymous informant, and that a contact had been made through one Mrs. Fisher. Mrs. Fisher also testified on behalf of the appellant relative to the arrangements made for appellant's surrender to the police. As to the issue of consent, defendant herself testified that she signed the written form. Officer Arce testified in the People's case-in-chief that, after her arrest, appellant assisted the police in recovering items of evidence from her home, that she gave consent to search the house, that the police had asked appellant to sign a consent form and that, in fact, he filled out a form for her to sign. The trial court properly sustained the People's objection to appellant's question as to whether or not she actually signed the consent form, since the signing of said form after arrest was not, in and of itself, probative on the issue of consciousness of guilt. In any event, appellant could not have been prejudiced because the evidence still came in.

As to the witness, Mr. Fernandes, the questions objected to by the trial judge were either irrelevant or unintelligible or had already been asked and

answered. The court was perfectly justified in asking counsel to rephrase his questions in a more coherent manner. ■ The trial court has an inherent power to exercise reasonable control over all proceedings connected with the litigation before it and said control should be exercised by the court in order to insure the orderly administration of justice. (See *Cooper v. Superior Court* (1961) 55 Cal.2d 291, 301 [10 Cal.Rptr. 842, 359 P.2d 274].) The court was correct in sustaining an objection as to certain conversations Investigator Arce had with Mrs. Fisher, as such testimony would be based on hearsay.

The trial court has a clear duty to supervise the conduct of the trial to the end that it may not be unduly protracted. ■ The control of cross-examination is not only within the discretion of the trial court, but, in the exercise of that discretion, the court may confine cross-examination within reasonable limits and may curtail cross-examination which relates to matters already covered or which are irrelevant. Only a manifest abuse of the court's discretion will warrant a reversal. Here, we find that there was no such manifest abuse. (See *People v. Stuller* (1970) 10 Cal.App.3d 582, 598 [89 Cal.Rptr. 158, 41 A.L.R.3d 712]; *People v. Swayze* (1963) 220 Cal.App.2d 476, 505 [34 Cal.Rptr. 5].)

### PROSECUTORIAL MISCONDUCT

Defendant cites several instances of what she claims amounted to misconduct of the prosecutor during argument to the jury. ■ A prosecutor may, however, draw any reasonable inferences or deductions from the evidence presented to the jury (see *People v. Silva* (1953) 41 Cal.2d 778, 783 [264 P.2d 27]), and wide latitude is ordinarily given to the prosecutor to draw such reasonable inferences. (See *People v. Bain* (1971) 5 Cal.3d 839, 847 [97 Cal.Rptr. 684, 489 P.2d 564]; *People v. Beivelman* (1968) 70 Cal.2d 60, 76-77 [73 Cal.Rptr. 521, 447 P.2d 913], overruled on another point in *People v. Green* (1980) 27 Cal.3d 1, 33 [73 Cal.Rptr. 521, 447 P.2d 913].)

■ If the defendant fails to object to the alleged improper remarks of the prosecutor during the trial and requests an appropriate admonition, the objections normally are waived and cannot be raised on appeal. (See *People v. Green, supra,* 27 Cal.3d 1, 27, and cases cited therein.) The general exception to this rule is where a timely objection and admonition would not have cured the harm. In that situation, the court must then reach the issue as to whether on the whole record the harm resulted in a miscarriage of justice within the meaning of the state Constitution. (Cal. Const., art. VI, § 13; *People v. Green, supra,* 27 Cal.3d 1, 34.)

██ If the defendant does object and the court gives the requested instruction, it would ordinarily be presumed that the jury heeded the admonition and the error was cured. However, the defendant in such a case is entitled to raise the error on appeal and argue that, despite the admonition, the misconduct requires reversal of his conviction. If he does so, the appellate court is bound to resolve his contention by application of the constitutional standard for review of a claim of prejudicial error, i.e., that the judgment will not be reversed unless the court is of the opinion, based on the whole record, that the error resulted in a miscarriage of justice. In determining whether there was a miscarriage of justice, the court will consider such factors as whether the evidence was close and the defendant's guilt in doubt, whether the misconduct was deliberate and repeated, and whether it was likely to have contributed materially to the verdict. (*People* v. *Green, supra,* 27 Cal.3d 1, 29.)

Applying the foregoing principles to the instant case, we conclude that there was no prosecutorial misconduct during final argument. Most of appellant's objections are raised for the first time on appeal, and, while we do not specifically delineate each one individually, suffice it to say that a timely objection and admonition as to those alleged "errors" would have cured the harm. Most of the objections actually raised at trial consisted of claims that the prosecutor was arguing outside the scope of the evidence and were properly overruled. Even if the trial judge was in error on these rulings, sufficient admonitions were given so as to cure any errors.[10]

██ As to those objections raised by defense counsel to the effect that the prosecutor was arguing his personal beliefs, the jury was properly admonished to disregard any personal beliefs and to rely on their own understanding of the evidence.[11] It must be presumed that the jury followed the

---

[10]See footnote 11, *infra.*

[11]There was a defense objection to the prosecutor's remarks as to where Casimiro went over to the fence at the time of the shooting and also as to the time frame involved. The following colloquy took place between the trial judge, the prosecutor, Mr. Pregerson and defense counsel, Mr. Fasteau in the presence of the jury:

"MR. FASTEAU: Excuse me, Your Honor. [¶] I will object as to a statement like that. There is no evidence of that. It misstates the facts of the case.

"THE COURT: He can argue the inferences to be drawn from the evidence, counsel. The jury will decide whether or not his argument is logical and reasonable.

"MR. FASTEAU: My question is—my objection is based on the statement that 'There is no question of that.' [¶] There is, because that has not been conceded.

"THE COURT: It's not important what counsel think; it's important what the jury thinks. [¶] The objection is overruled.

"⸱ ⸱ ⸱ ⸱ ⸱ ⸱ ⸱ ⸱ ⸱ ⸱ ⸱ ⸱ ⸱ ⸱ ⸱ ⸱

"THE COURT: Mr. Pregerson, make it clear to the jury, if you please, if it is the case that you are discussing only the evidence and not your personal opinions.

"MR. PREGERSON: Very well, Your Honor. [¶] When I say—

"THE COURT: Excuse me. [¶] Since the attorneys weren't there, obviously, ladies and

trial judge's admonitions. (*People* v. *Green, supra,* 27 Cal.3d 1, 29.) Appellant argues that despite the admonitions the misconduct requires reversal. We do not agree. The alleged errors did not result in a miscarriage of justice in this case since the prosecutor's conduct does not appear to be deliberate and repeated. Further, such comments would not likely have contributed materially to the verdict. The court repeatedly told the jury that it was their recollection of the evidence that was controlling.[12]

The prosecutor's comments as to delay in the trial of the case, were objected to by the defendant and properly sustained by the court with the

---

gentlemen, they have to structure their argument based on the evidence that—the inferences to be drawn from the evidence, and it's your function to decide whether or not these inferences that they argue to you are reasonable or unreasonable. [¶] Attorneys don't express their personal opinions or should not express their personal opinions in argument. Sometimes it sounds like they are. [¶] I'm sure that counsel mean that the conclusions that he reached are derived from the evidence. [¶] Is that what you meant?

"MR. PREGERSON: That is correct, Your Honor.

"THE COURT: All right.

"MR. PREGERSON: Any time I [say] I know[,] or this is what happened, I am saying I know or this is what happened based upon the evidence. I think that's clear. I have no knowledge that you do not have.

"MR. FASTEAU: Excuse me. [¶] Before Mr. Pregerson goes on, Your Honor, could we approach the bench so I can make my point clear in this regard?

"THE COURT: I thought you made it quite clear, and I felt that he has now indicated to the jury quite clearly that he has no evidence, no information about the case that they don't have, and he's arguing the inferences they should draw from the evidence, just as you did.
". . . . . . . . . . . . . . . . . . . . . . . .

"THE COURT: Well, no. The argument is proper as long as it clearly indicates to the jury that Mr. Pregerson's conclusions are based upon the evidence and not on any personal knowledge. [¶] I'm satisfied that has been done.
". . . . . . . . . . . . . . . . . . . . . . . .

"THE COURT: If he strays away from the evidence, the jury, having paid close attention, will realize that and give his argument less weight, counsel."

Shortly thereafter, in response to another objection from defense counsel, the court stated:

"THE COURT: Counsel, as you well know the attorneys can argue inferences that may be drawn from evidence as well as the evidence itself, and I don't want you to continually interrupt. [¶] If counsel, either counsel misstates the evidence, it's the function of the jury to remember and to have in their notes and in their heads what the evidence was. [¶] I'm not going to go back and make rulings as to what all the testimony was. The District Attorney can argue the inferences to be drawn from the evidence. [¶] The objection is overruled."

At the onset of his argument, the prosecutor told the jury that statements from counsel are not evidence. He further said, "The evidence is what you people heard."

[12]See footnote 11, *supra.*

At one point, during final argument, the following took place:

"MR. FASTEAU: Your Honor, I object. Certain things have not been acknowledged by the defense. It misstates the evidence.

"THE COURT: Well, I'm not sure what is acknowledged or not acknowledged, Mr. Pregerson. [¶] You can continue your argument with what the evidence shows."

Shortly thereafter, the court remarked: "Counsel, the jury heard the evidence, and between the 12 of them, I'm sure they can figure out what correct state of affairs is. [¶] From time to time, ladies and gentlemen, counsel's recollection of the evidence might be at variance with yours. [¶] If that happens, then it's your view of the evidence, of course, that is controlling."

comment of "no evidence before the jury." The court then told the jury to disregard the remarks concerning the trial date and the prosecutor dropped the issue.

 Finally, appellant argues that the prosecutor was asking the jury to "compromise" their vote.[13] The trial judge overruled this objection. We find no error in the court's ruling. The prosecutor was simply recommending a verdict to the jury, and stating that if they returned a lesser verdict, he would not be offended.

This case is remanded back to the trial court for resentencing in accordance with the views expressed herein. The judgment of conviction is otherwise affirmed on appeal.

Feinerman, P. J., and Stephens, J., concurred.

---

[13]The prosecutor said the following: "But this is not a case of involuntary manslaughter. If she said she was pointing the gun at him and it had a hair trigger and it might—if she had cocked it, and you'll see, some of you have had some knowledge with guns, if you cock a gun, it then has a hair trigger, and she says it went off accidentally when a car went by and backfired and I got scared, then you might be talking about involuntary manslaughter. But it really isn't an applicable situation here. Again, let me say to you as far as I am concerned, if 12 jurors agree that she is criminally responsible for what she did, I want you to discuss it and kick it around, and I would like you to reach a verdict, and if that means dropping down, you're not offending me."