[No. B017967. Second Dist., Div. Four. Jan. 20, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
RALPH DAVID SCHILLING, Defendant and Appellant.

**COUNSEL**

John F. M. Rodriguez, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John R. Gorey and Christine C. Franklin, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**McCLOSKY, J.**—A jury found defendant Ralph David Schilling guilty of voluntary manslaughter (Pen. Code, § 192), a lesser and necessarily included offense of murder (Pen. Code, § 187) with which he was originally charged. The jury further found true the allegation that defendant personally used a firearm during the commission of the offense. (Pen. Code, §§ 12022.5 and 1203.06, subd. (a)(1).) Defendant was sentenced to state prison, and he now appeals.

Defendant contends (1) that the trial court erroneously denied his motion to quash and traverse search warrant No. 23717 and (2) that the trial court erred in limiting his cross-examination of a particular witness. We shall conclude that neither of these contentions is meritorious and shall affirm the judgment.

Search warrant No. 23717, which was executed and served on February 6, 1985, authorized law enforcement officials to search defendant's residence in Arleta, California. Defendant maintained that his motion to quash and traverse should have been granted and the evidence obtained as the result of the search of his residence suppressed because the search warrant was not supported by probable cause and because it failed to describe with particularity the items to be seized.

The offense in this case occurred on January 13, 1985, after the effective date of Proposition 8, an initiative measure in the June 1982 Primary Election that added article I, section 28 to the California Constitution.[1] Subdivision (d) of section 28, which, in general terms, proscribes the exclusion of relevant evidence in a criminal proceeding,[2] eliminates in California the judicially created remedy of exclusion of evidence obtained in violation of the search and seizure provisions of article I, section 13 of the California Constitution and the Fourth Amendment to the United States Constitution when that evidence is admissible under the federal Constitution. (See *In re Lance W.* (1985) 37 Cal.3d 873, 886-887 [210 Cal.Rptr. 631, 694 P.2d 744]; *People* v. *Luevano* (1985) 167 Cal.App.3d 1123, 1128 [213 Cal.Rptr. 764]; *People* v. *Aho* (1985) 166 Cal.App.3d 984, 989-990 [212 Cal.Rptr. 686], cert. den., *Aho* v. *California,* 474 U.S. 995 [88 L.Ed.2d 360, 106 S.Ct. 409].)

In determining first whether the search warrant under attack in this case was supported by probable cause, we turn to *Illinois* v. *Gates* (1983) 462 U.S. 213 [76 L.Ed.2d 527, 103 S.Ct. 2317], in which this nation's highest court abandoned the "two-pronged test" established by its *Aguilar*[3] and *Spinelli*[4] decisions and adopted a totality-of-the-circumstances analysis to be applied when assessing whether a search warrant is supported by probable cause. (462 U.S. at p. 238 [76 L.Ed.2d at p. 548].)

Under *Illinois* v. *Gates,* "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." (462 U.S. at p. 238 [76 L.Ed.2d at p. 548].) It is our duty as the reviewing court "simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed. [Citation.]" (*Id.,* at pp. 238-239 [76 L.Ed.2d at p. 548].)

The *Gates* court stressed, however, that "[a]n affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause, ... Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others. In order to ensure that such

---

[1]Article I, section 28 applies only to prosecutions for crimes committed on or after June 9, 1982, its effective date. (*People* v. *Smith* (1983) 34 Cal.3d 251, 257-258 [193 Cal.Rptr. 692, 667 P.2d 149].)

[2]Article I, section 28, subdivision (d) provides: "Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding, ...."

[3]*Aguilar* v. *Texas* (1964) 378 U.S. 108 [12 L.Ed.2d 723, 84 S.Ct. 1509].

[4]*Spinelli* v. *United States* (1969) 393 U.S. 410 [21 L.Ed.2d 637, 89 S.Ct. 584].

an abdication of the magistrate's duty does not occur, courts must continue to conscientiously review the sufficiency of affidavits on which warrants are issued." (462 U.S. at p. 239 [76 L.Ed.2d at p. 549].)

With these principles in mind, we proceed to determine whether the search warrant was supported by probable cause.

The search warrant under attack in this case was issued on the basis of the affidavit of Rene Laporte (Laporte), a peace officer employed by the Los Angeles County Sheriff's Department assigned to homicide bureau. In a seven-page statement of probable cause, Laporte set forth the following facts:

At 11:10 a.m. on January 16, 1985, Laporte was assigned to investigate the death of a woman, later identified as Chantel Houston, whose body had been found earlier that morning by patrol deputies on the side of a hill near Little Tujunga Canyon Road in the Angeles National Forest. Laporte observed that the woman had been shot once in the head and once in the chest. She was clothed but had no shoes or purse.

On January 17, 1985, Laporte was present during the autopsy performed on the dead woman's body by Dr. Eva Heuser of the Los Angeles Coroner's office. Dr. Heuser stated that both gunshots were fatal and that the weapon used to inflict death was possibly a medium caliber handgun. She also removed the contents of the deceased's stomach.

On January 24, 1985, Laporte contacted Lynne Herold, the criminalist who examined and analyzed the contents removed from the woman's stomach. Herold informed Laporte that she found seafood, possibly shrimp, red meat, chives, potato, and possibly onion. Herold opined that the victim may have eaten some type of seafood chowder.

On January 31, 1985, Laporte met with a man named William J. Jacobs at the coroner's office. Jacobs stated that he was the owner of an out-call massage service. His office was located at his residence on Vermont Boulevard in Los Angeles. Jacobs and Gwenda Williams, one of Jacobs's employees, identified the woman, who had been designated Jane Doe No. 8, as Chantel Houston who worked for Jacobs's out-call massage service and who had been missing since the evening of January 13, 1985.

Jacobs and Williams then related the following events to Laporte: At approximately 3:30 p.m. on January 13, 1985, Jacobs, Williams and Houston ate at the Sizzler restaurant on Hollywood Boulevard in Los Angeles. Houston had a steak and all-you-can-eat shrimp dinner and two bowls of

clam chowder. The three of them returned to the office on Vermont between 4:30 and 5 p.m.

Jacobs informed Laporte that he had known Houston for about two months and that she had been working for him during that period. Jacobs also stated that the victim was living at the Bahia Motel on Sunset Boulevard, was from Washington, and was planning to leave for Portland, Oregon on the evening of January 13, 1985, with her boyfriend Irvin Johnson. According to Jacobs, Houston accompanied him and Williams back to the office so she could do her laundry and possibly get one last appointment and make some pocket money for her trip to Oregon.

Laporte also learned that at approximately 6:30 p.m., a customer called the service and spoke with Houston. Houston told Williams that she had a 7 p.m. appointment and left in a white two-door Plymouth Duster bearing license number 013MOR. Williams stated that Houston was wearing black pump type shoes with a short heel and carrying a small black purse with a zipper on top and a black shoulder strap.

Houston's 7 p.m. appointment was written down on a telephone memo pad. The pertinent portion of that telephone memo pad reflects that at 6:34 p.m. on January 13, 1985, a man who identified himself as Ralph Schilling called the out-call service and requested that someone come to 9652 Bartee Avenue in Arleta. His telephone number was listed as 897-4922.

Williams also informed Laporte that Houston called the office at 7 p.m. from the customer's residence and stated that the customer did not want her because she was Black. Williams herself spoke to the customer who told Williams that he did not like Houston because she was Black. When Williams asked the customer if he wanted someone else he stated that he did not. Houston then got back on the telephone and told Williams that she was leaving and would see her shortly.

When Houston did not return by 8 p.m., Williams called (818) 897-4922 and spoke with the customer. He told her that Houston had left right after she called the office.

Also on January 31, 1985, Laporte spoke with Constance Nesbill, and on February 1, 1985, he spoke with Seanna Newton. Both of these women informed Laporte that they worked for Jacobs's out-call service. During the night of January 13, 1985, or the early morning of January 14, 1985, Nesbill and Newton went together to an out-call in Burbank. Both were aware that Houston had not returned from her appointment and were concerned. After their appointment, they drove by 9652 Bartee Avenue in Arleta where they

observed what they believed to be a white Duster with four doors parked in the driveway. As they knew the victim's car had only two doors, they did not pursue the matter.

On January 31, 1985, Laporte spoke with the victim's boyfriend Irvin Poindexter, also known as Irvin Johnson. Poindexter stated that at approximately 2:30 p.m. on January 13, 1985, he was at the Bahia Motel with Houston who planned to go to the office on Vermont to do her laundry. Later that evening they were going to Portland, Oregon. Poindexter went to his cousin's house in Pasadena. Later that evening when he called Houston at the office she told him that she wanted to wait awhile to see if she could get another appointment so she would have some money for their trip.

When Poindexter called the office later, he learned that Houston had gotten an appointment and would be returning soon. Poindexter went back to the Bahia Motel to wait for Houston who never returned.

Poindexter further informed Laporte that in the afternoon of January 16, 1985, he went to 9652 Bartee Avenue, contacted Ralph Schilling, and told him he was looking for his sister. Schilling told Poindexter that he had not wanted a Black woman, that he gave her gas money, and that she left.

Laporte checked the G.T.E. Street and Address Directory dated November 1984 which revealed that Ralph Schilling lived at 9652 Bartee Avenue in Arleta and had the telephone number 897-4922.

On February 4, 1985, Laporte contacted Dr. Allen of the Los Angeles County Coroner's office from whom he learned that under normal conditions the average person empties his or her stomach within three to five hours.

Laporte also retraced the probable route of the victim and learned that it took approximately 20 minutes to get from the out-call office at 1175 North Vermont Avenue to 9652 Bartee Avenue in Arleta. Laporte further noted that when leaving the Bartee address, if he took Osborne Avenue north for approximately four miles, Osborne Avenue turned into Little Tujunga Canyon Road where Houston's body was found seven miles further.

On February 5, 1985, Laporte contacted Ralph Schilling who admitted to calling the out-call service on January 13, 1985, and speaking to Houston. Schilling further admitted that he made an appointment with Houston, but when she arrived at his residence at approximately 7:45 p.m. and he realized that she was Black, he told Houston that he did not want her. Schilling informed Laporte that he allowed Houston to come into his house and call her office and verified that he himself spoke with the service. Schilling stated

that after Houston called her office, she asked for gas money. He gave her $5 and then, according to Schilling, Houston left.

Schilling further informed Laporte that his landlord and landlord's wife were out of town on January 13, 1985, and that his neighbor had her green Maverick parked in the driveway. He further stated that his girlfriend came over at 9 p.m. and stayed the night and that he left his house only once at 10:15 p.m. to deposit a $100 bill at the Interstate Bank at Roscoe and Van Nuys.

Laporte contacted Fred Elliot, general manager of Barish Chrysler Plymouth on 444 S. LaBrea Avenue in Los Angeles. Elliot informed Laporte that Plymouth never made a four-door Duster. Laporte opined that Nesbill and Newton may in fact have seen the victim's vehicle at defendant's residence on the night of January 13 or the early morning of January 14, 1985, and mistakenly reported seeing a four-door Duster.

On the basis of this information, Laporte believed that defendant killed Houston at his residence and dumped her body at the location where it was subsequently discovered, and that evidence of this crime would be found at defendant's residence.

After reviewing Laporte's affidavit, the magistrate concluded that there existed probable cause to believe that property used to commit a felony and evidence which tended to demonstrate that a felony was committed or that a particular person committed it would be found at 9652 Bartee Avenue in Arleta. Having so concluded, the magistrate on February 6, 1985, issued a warrant commanding law enforcement officials to search said premises for and to seize the following property: "Firearms, ammunition, expended rounds or cartridges. Victim's shoes, purse, identification, phone book, cosmetics, 5″ folding knife with brown handle. Scientific evidence, including but not limited to fingerprints, powder burns, blood, blood spatters, photographs, measurements, bullet holes, hairs, fibers. Bills in the name of Ralph Schilling and bank papers from First Interstate Bank."

Defendant's lack of probable cause challenge is general and conclusional. Defendant does not challenge the competency of the evidence set forth in Laporte's affidavit, nor does he challenge the existence of probable cause with respect to any specific item designated for seizure by the magistrate in the search warrant. Rather, he focuses on the "[s]cientific evidence, including but not limited to" language of the warrant.

■ Viewing Laporte's affidavit under the totality-of-the-circumstances test of *Illinois* v. *Gates,* we note that it was much more than a "bare bones"

affidavit stating in a conclusional fashion the existence of probable cause. To the contrary, Laporte in his affidavit set forth detailed facts which provided the magistrate with a substantial basis for making her own independent determination that there was a fair probability that defendant shot Houston and that evidence of that crime would be found at his residence.

■ Given the particulars of this case, probable cause supported the seizure of all items specified in the warrant with the exception of the victim's five-inch folding knife with brown handle. While Williams informed Laporte that Houston took her purse with her to the appointment with defendant, while Houston's purse was not found with her body, and while there was a fair probability that her purse could be located at defendant's residence, there are no facts in Laporte's affidavit establishing that Houston carried that particular knife or any knife in her purse or on her person.

Despite defendant's lack of specific challenge thereto, we conclude that that portion of the search warrant authorizing the seizure of a five-inch folding knife with brown handle is invalid. Since, however, none of Houston's belongings were found during the search of defendant's residence, this invalidity has no bearing on the outcome of this appeal as it certainly did not serve to invalidate the entire search warrant.

■ Next defendant contends that the search warrant was constitutionally invalid because it failed to describe with particularity the items to be seized under authority of the warrant.

■ It is a state and federal constitutional requirement that a search warrant state with descriptive particularity the things to be seized. (U.S. Const., 4th Amend.; Cal. Const., art. I, § 13.) "[T]he issue of particularity resolves itself identically under both federal and California standards, . . ." (*People* v. *Tockgo* (1983) 145 Cal.App.3d 635, 640, fn. 2 [193 Cal.Rptr. 503].)

■ "Whether the description in the warrant of the property to be seized is sufficiently specific is a question of law on which an appellate court makes an independent judgment." (*People* v. *Frank* (1985) 38 Cal.3d 711, 725 [214 Cal.Rptr. 801, 700 P.2d 415].) ■ " 'The requirement of particularity is designed to prevent general exploratory searches which unreasonably interfere with a person's right to privacy. . . . [T]his requirement is held to be satisfied if the warrant imposes a meaningful restriction upon the objects to be seized.' In short, 'Nothing should be left to the discretion of the officer.' " (*Id.,* at p. 724, quoting *People* v. *Dumas* (1973) 9 Cal.3d 871, 880 [109 Cal.Rptr. 304, 512 P.2d 1208].)

At the hearing on defendant's motion to quash and traverse the search warrant, defendant specifically challenged that portion of the warrant which

authorized the search for and seizure of "[s]cientific evidence, including but not limited to fingerprints, powder burns, blood, blood spatters, photographs, measurements, bullet holes, hairs, fibers."

Defendant contends that the language "[s]cientific evidence, including but not limited to" violates the constitutional requirement of particularity and in essence authorizes a general or exploratory search for all evidence. This contention is meritless.

First of all, the language which defendant challenges on appeal cannot be assessed, as he would have us do, in a vacuum. It must be read in conjunction with the language which immediately follows, namely, "fingerprints, powder burns, blood, blood spatters, photographs, measurements, bullet holes, hairs, fibers." This inclusive generic description of scientific evidence followed.by a specific description of particularized scientific evidence to be seized clearly passes constitutional scrutiny.

"The 'reasonable particularity' required is a flexible concept, reflecting the degree of detail available from the facts known to the affiant and presented to the issuing magistrate. This while a generic description of illicit objects will be held sufficient where probable cause is shown and no more specific identification is possible [citation], greater 'specificity [is] required for the seizure of goods whose identity is known, such as stolen goods . . . .' [Citation.]" (*People* v. *Tockgo, supra,* 145 Cal.App.3d at p. 640.)

The facts known by Laporte and communicated by affidavit to the issuing magistrate clearly gave rise to a reasonable belief that defendant may have shot Houston in his residence. There was therefore a reasonable basis for believing that scientific evidence confirming Houston's presence and death in defendant's residence could be found on the premises.

The specific language "fingerprints, powder burns, blood, blood spatters, photographs, measurements, bullet holes, hairs, fibers" was clearly a particularized specification of the scientific evidence that could reasonably be obtained in defendant's residence in light of the facts set forth in Laporte's affidavit. The inclusive generic language "[s]cientific evidence, including but not limited to" simply authorize seizure of additional scientific evidence that Laporte was unable to detail. Defendant does not contend that the facts known to Laporte required greater particularization of the scientific evidence subject to seizure.

In summation, we conclude that that portion of the search warrant pertaining to the seizure of scientific evidence imposed a meaningful restriction on the objects subject to seizure and hence on the discretion of the

officer's serving the search warrant. The language was reasonably specific under the circumstances of this case and did not countenance "a general, exploratory rummaging in a person's belongings" (*Coolidge* v. *New Hampshire* (1971) 403 U.S. 443, 467 [29 L.Ed.2d 564, 583, 91 S.Ct. 2022]) for any property.

■ Defendant contends that he was denied his right to confront and cross-examine adverse witnesses guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution when the trial court prohibited him from pursuing a line of questioning designed to elicit evidence from witness Poindexter during cross-examination that he himself killed Houston and therefore had an interest in the outcome of the trial. This contention is meritless.

The trial court rejected as "absolutely sheer speculation" defense counsel's proposed theory that Poindexter who was Houston's boyfriend killed Houston because he was unhappy with her occupation. The trial court ruled that in the absence of any evidence to substantiate that theory, defendant would be precluded from pursuing it. The trial court did, however, expressly inform defense counsel that if he had evidence which suggested that Poindexter was the killer then he could introduce it.

On appeal defendant does not challenge the trial court's finding that there was an absence of evidence to support his speculative theory that Poindexter could be the killer. He maintains only that it was reversible error to preclude him from inquiring into Poindexter's possible motives and ultimately his credibility.

"Although the right to cross-examine is a significant element in a criminal case, implicit in the constitutional right of confrontation [citation], it is within the court's discretion to conduct the trial and limit cross-examination to those matters properly relevant and admissible. [Citation.]" (*People* v. *Schwartzman* (1968) 266 Cal.App.2d 870, 890 [72 Cal.Rptr. 616]; see also *People* v. *Beach* (1983) 147 Cal.App.3d 612, 628 [195 Cal.Rptr. 381].) Reversal is warranted only when there has been a manifest abuse of discretion. (*People* v. *Beach, supra,* 147 Cal.App.3d at p. 628.)

When cross-examination is designed to impeach a witness, "the trial judge is expected to allow a wide-ranging inquiry as to any factor which could reasonably lead the witness to present less than reliable testimony." (*In re Anthony P.* (1985) 167 Cal.App.3d 502, 507 [213 Cal.Rptr. 424].) While we are cognizant that "[c]ross-examination cannot serve its critical function unless trial lawyers are given wide latitude in the scope, subject matter and technique of their questioning" and that "[t]his is especially true when the

cross-examiner is testing the credibility of a witness" (*ibid.*), we cannot conclude in this case that defendant was denied his right to effective cross-examination.

The constitutional right to confront and cross-examine adverse witnesses does not include the right to ask wholly speculative questions ungrounded in factual predicate even when posed in the quest to discredit a witness. In the absence of any evidence supporting defendant's speculative theory that Poindexter killed Houston, we cannot conclude that the trial court abused its discretion in limiting defense counsel's cross-examination of Poindexter.

The judgment is affirmed.

Woods, P. J., and Kingsley, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 15, 1987.