Filed 6/25/19

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>BRYAN ALEXANDER,<br><br>     Defendant and Appellant. | A151809<br><br>(San Francisco County<br>Super. Ct. No. SCN220303-01) |
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>RAY A. FARR,<br><br>     Defendant and Appellant. | A152247<br><br>(San Francisco County<br>Super. Ct. No. SCN220303-02) |

Following a series of robberies in August and September 2012, a San Francisco police officer reviewed police reports of the crimes and surveillance video of eight of them before arresting defendants and appellants Bryan Alexander and Ray Farr.[1] Alexander and Farr subsequently pled guilty to several of the offenses. In the published portion of this opinion we reject appellants' contention the trial court erred in denying their motion to suppress evidence discovered pursuant to their warrantless arrest. We conclude, among other things, the trial court properly admitted the officer's testimony

_____

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II and III.
[1] By separate order this court has consolidated appellants' appeals for purposes of argument and decision.

1

that the videos helped provide probable cause for appellants' arrest. We reject appellants' arguments this testimony constituted hearsay, relied on unauthenticated writings and violated the secondary evidence rule. Further, we determine the information possessed by the officer was sufficiently reliable to justify the arrest. In the unpublished part of this opinion, we reject appellants' claim the trial court erred in calculating conduct credits, and we remand to the trial court to exercise its discretion regarding whether to strike a five-year sentence enhancement imposed on Alexander based on a prior serious felony conviction.

## BACKGROUND

In April 2017, appellants were charged in a first amended information with 14 counts of second-degree robbery (Pen. Code, § 211);[2] nine counts of second-degree burglary (§ 459); and one count of receiving stolen property (§ 496, subd. (a)). Farr was charged with two additional counts of second degree robbery; one additional count of second degree burglary; one count of making a criminal threat (§ 422); and one count of assault with force likely to cause great bodily injury (§ 245, subd. (a)(4)). The information also alleged that Alexander had suffered three prior prison terms (§ 667.5, subd. (b)) and one prior violent or serious felony conviction (§ 667), and the information alleged that Farr had suffered six prior prison terms (§ 667.5, subd. (b)).

Prior to the filing of the amended information, Alexander moved under section 1538.5 to suppress evidence discovered pursuant to the warrantless arrest of himself and Farr, and Farr joined in the motion. In June 2016, following a hearing, the trial court denied the motion.

In May 2017, pursuant to a negotiated disposition, Alexander pleaded guilty to three counts of robbery (counts 12, 23, and 26) and admitted a prior conviction for attempted robbery and one prior prison term. Farr pleaded guilty to two counts of robbery (counts 5 and 14) and admitted four prior prison terms.[3]

---

[2] All undesignated statutory references are to the Penal Code.
[3] The facts of the robberies to which appellants pleaded guilty are not relevant on appeal.

In June 2017, in accordance with the plea bargain, the trial court sentenced Alexander to 14 years in prison, consisting of four years on count 12, two years on count 23, two years on count 26, five years for the prior conviction of attempted robbery (§ 667, subd. (a)(1)), and one year for the prior prison term.[4]  Alexander was given credit for time served of 2,002 days, consisting of 1,741 days in jail and 261 days of conduct credit.  The trial court sentenced Farr to 10 years in prison, consisting of five years on count five, one year on count 14, and one year for each of the four prison priors.  Like Alexander, Farr was given credit for time served of 2,002 days, consisting of 1,741 days in jail and 261 days of conduct credit.

Both Alexander and Farr appealed.

DISCUSSION

I.    *The Trial Court Did Not Err in Denying Appellants' Motion to Suppress*

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ."  (U.S. Const., 4th Amend.)  Under section 1538.5, subdivision (a)(1)(A), a defendant may move to suppress evidence on the ground that a "search or seizure without a warrant was unreasonable."  "A warrantless search is presumed to be unreasonable, and the prosecution bears the burden of demonstrating a legal justification for the search.  [Citation.]  'The standard of appellate review of a trial court's ruling on a motion to suppress is well established.  We defer to the trial court's factual findings, express or implied, where supported by substantial evidence.  In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment.' "  (*People v. Redd* (2010) 48 Cal.4th 691, 719.)

---

[4] The abstract of judgment in Alexander's case incorrectly describes the five-year enhancement under section 667, subd. (a)(1) as being under section 667.5, subd. (a), which does not provide for a five-year enhancement.  We will direct that the abstract of judgment be corrected on remand.

" '[A] warrantless arrest by a law [enforcement] officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed.' " (*People v. Thompson* (2006) 38 Cal.4th 811, 817.) " 'Probable cause exists when the facts known to the arresting officer would persuade someone of "reasonable caution" that the person to be arrested has committed a crime.' " (*Id.* at p. 818.) Where an officer makes a warrantless arrest based on a belief they have probable cause to do so, "the officer must testify to the facts or information known to him on which his belief is based" because "the court and not the officer must make the determination whether the officer's belief is based upon reasonable cause." (*People v. Boyles* (1955) 45 Cal.2d 652, 656.) The prosecution bears the burden of proving the reasonableness of a warrantless arrest. (*People v. Williams* (1999) 20 Cal.4th 119, 130.)

The central issue on appeal is whether the arresting officer's testimony regarding the robbery surveillance videos was admissible and sufficient to establish probable cause for the warrantless arrest of appellants.

A.      *Sergeant Maguire's Testimony at the Hearing on the Motion to Suppress*

San Francisco Police Sergeant Thomas Maguire investigated a series of 10 robberies in August and September 2012. The suspects were two African-American males, one taller and thinner than the other. Maguire obtained police reports regarding all of the incidents and surveillance videos of eight of the incidents. He viewed and compared the videos multiple times. Maguire testified about his investigation of seven of the robberies.

First, a robbery was reported on August 19, 2012, at the San Bruno Cafe. Another police officer, Sergeant Discenza, gave Sergeant Maguire a surveillance video, saying it came from the cafe robbery. The video showed a single robber in a leather jacket. Maguire identified two photographs as stills from the video, admitted as exhibits 1 and 2.

Second, a robbery was reported on August 26, 2012, at a Round Table Pizza on Mission Street. Sergeant Maguire responded to the scene, interviewed witnesses, and viewed surveillance video that showed two African-American male suspects commit a robbery as described by the witnesses. One suspect was taller and thinner than the other.

4

Maguire believed one of the two suspects was also the perpetrator of the San Bruno Cafe robbery.

Third, a robbery was reported on August 28, 2012, at a business called Underdog on Irving Street. Sergeant Maguire went to the location and watched a surveillance video, which showed a sole robbery suspect.

Fourth, a robbery was reported on September 7, 2012, at a Burger King. Sergeant Maguire responded to the scene and watched a surveillance video that showed two African-American male suspects, one taller and thinner than the other. Maguire believed they were the same two suspects he had seen in the video from the Round Table robbery. The shorter and heavier suspect was wearing a brown long-sleeved shirt and black shoes with white soles. Maguire identified two photographs as stills from the video, admitted as exhibits 4 and 5.

Fifth, a robbery was reported on September 10, 2012, at a business called "Uniqlo Services" on Ocean Avenue. Sergeant Maguire obtained the police report and surveillance video. The video showed two African-American male suspects, one taller and thinner than the other. Maguire identified one photograph as a still from the video showing a person who he believed to be the shorter suspect, admitted as exhibit 6. He was wearing black shoes with white soles, like those worn by the shorter suspect in the Burger King robbery.

Sixth, a robbery was reported on September 11, 2012, at a business called "The Hot Tubs" on Van Ness Avenue. Sergeant Maguire obtained the police report and surveillance video of the incident and went to the scene the day after the robbery. The video showed two African-American male suspects, one taller and thinner than the other. Maguire identified four photographs as stills from the video, admitted as exhibits seven through ten. Exhibits seven and eight showed the shorter suspect wearing a dark-colored beanie cap and black shoes with white soles. Exhibits nine and ten showed the taller suspect, who had "scruffy" facial hair and was wearing a hooded sweatshirt.

Seventh, a robbery was reported on September 14, 2012, at a Subway shop on Polk Street. Sergeant Maguire read the police report and viewed the surveillance video

5

that was collected in the investigation. He also went to the scene and spoke to people who described the incident. The shop looked the same as it did on the video, and the witnesses' description of the robbery matched what he saw in the video. The video showed two African-American male suspects, one taller and thinner than the other. Maguire identified two photographs as stills from the video, admitted as exhibits 11 and 12.

Sergeant Maguire arrested appellants on September 16, 2012. At 5:54 p.m. on that day, he heard a broadcast reporting a robbery at a restaurant called "Sweet Chinito" on Mission Street. The suspects were described as two African-American men, one taller and one shorter. Maguire thought they might be the perpetrators in the robberies he was investigating.

After hearing the broadcast about the Sweet Chinito robbery, Sergeant Maguire went to the area of 7th Street and Market Street, because the dispatch said the victim's cell phones were stolen and stolen cell phones are often sold in that location. He arrived in the general area in an unmarked vehicle about 20 minutes after the broadcast and observed two men cross the street about 12 feet in front of him. He "immediately recognized" them as the suspects in the robberies he had been investigating. Both were African-American, and one was taller and thinner than the other. Maguire noticed the shorter man was wearing black shoes with white soles similar to those he had seen in several videos, as well as a leather jacket which resembled one worn by the suspect in the San Bruno Cafe robbery video. The shorter man's height, weight, build, face, and demeanor also resembled one of the suspects. The taller man was wearing dark pants and boots that resembled clothes worn by a suspect in the videos, and his facial features (including facial hair) and confident manner were similar to a suspect in the videos. Maguire identified Alexander as the shorter man and Farr as the taller man he observed on September 16, 2012.

Sergeant Maguire called for backup, followed appellants for a short distance, and then exited his vehicle and apprehended them at gunpoint. Maguire searched a black bag Farr was carrying and found two cell phones. Maguire asked an officer at the Sweet

6

Chinito restaurant to call the phones that had been stolen, and the phones recovered by Maguire rang. Another officer found car keys on Alexander that were connected to a white Chevy that looked like the getaway car in one of the robbery videos. Maguire searched the vehicle and found a black replica handgun and a dark-colored beanie cap.

Sergeant Maguire identified five photographs of appellants taken on September 16, 2012, admitted into evidence as exhibits 13 through 17.

### B. *The Trial Court's Ruling*

Appellants sought an order suppressing all evidence obtained as a result of the warrantless arrest. After argument from counsel, the trial court denied the motion to suppress. The court said it credited Sergeant Maguire's testimony that "he immediately recognized [appellants] as the suspects whom he had viewed on multiple times in multiple videotapes of prior and relatively recent robbery incidents." The court further found that some of the stills from the videos corroborated Maguire's testimony. Although the quality of the images varied, the court observed that the photos of the San Bruno Cafe robbery (exhibits one and two) were "fairly recognizable depictions" of Alexander, and the photos from the robbery at The Hot Tubs (exhibits nine and ten) were "pretty well recognizable depictions" of Farr.[5] The court concluded Maguire had probable cause to arrest appellants.

### C. *Admissibility of Sergeant Maguire's Testimony About the Robbery Videos*

Appellants contend the prosecution below failed to prove the surveillance videos that Sergeant Maguire described actually depicted the robberies he was investigating. More narrowly, they contend the prosecution failed to meet its burden on that point because Maguire's testimony connecting the videos to the robberies was based on hearsay. As appellant Alexander puts it, "no person with personal knowledge of any incident testified that the video watched by Maguire accurately depicted it, and no person

---

[5] The trial court, going from its memory, referenced exhibit numbers "10 and 11, or perhaps 11 and 12," but it is clear the court meant exhibits 9 and 10, which clearly depict the same person at the same robbery—exhibits 10 and 11 depict two different robberies and exhibits 11 and 12 depict two different people.

7

with personal knowledge testified how any incident was video recorded or how any video watched by Maguire was generated."

In arguing that Sergeant Maguire's testimony about the surveillance videos was inadmissible, appellants correctly observe that the hearsay rule was applicable during the hearing on the motion to suppress. (See *Hewitt v. Superior Court* (1970) 5 Cal.App.3d 923, 927 [in reference to hearings on motions to suppress, stating "Evidence Code section 300 makes it clear that, except as otherwise provided by statute, the Evidence Code applies to every evidentiary hearing in the state courts. . . ."]; *Jauregi v. Superior Court* (1999) 72 Cal.App.4th 931, 940 [in the context of forfeiture proceedings, stating "Accordingly, because no statute exists which exempts such an evidentiary hearing from the application of the Evidence Code, all Evidence Code provisions which deal with hearsay apply . . ."].)

Appellants then proceed to argue that Sergeant Maguire's assertions that the surveillance videos he viewed corresponded to the robberies under investigation was based on inadmissible hearsay. Appellants' contention is misplaced. It is true that Maguire's testimony was not based on his personal knowledge. Instead, his belief that the videos depicted the robberies was based on information received from witnesses to the robberies and other officers, based on the videos being associated with the cases in police records, or based on receiving the videos from the victims. However, "[i]t is settled . . . that reasonable cause to justify an arrest may consist of information obtained from others and is not limited to evidence that would be admissible at the trial on the issue of guilt." (*People v. Boyles*, *supra*, 45 Cal.2d at p. 656, citing *Brinegar v. United States* (1949) 338 U.S. 160, 171–176.)

More to the point, Sergeant Maguire's testimony was not subject to exclusion under the hearsay rule because, even though it was based on (mostly implied) extra-judicial statements, the testimony was not hearsay because it was offered only to show the information he relied on in deciding to arrest appellants. (Evid. Code, § 1200.) As explained in *People v. King* (1956) 140 Cal.App.2d 1, 5, "In each of the instances objected to by the appellant the extra-judicial statements were offered in evidence not to

8

prove the truth of the matter asserted, but to establish probable cause to effect the search and seizure.  The truth of the information given to [the officer] was not in issue, nor was it offered in evidence to prove any element of the offense against the appellant.  The evidence in question was offered solely to establish that the officer had reasonable or probable cause to effect the search and seizure."  (See also *Cantrell v. Zolin* (1994) 23 Cal.App.4th 128, 132–133 [in context of administrative hearing following arrest for vehicular offense, extrajudicial statement of officer about driver's conduct "was relevant to the issue whether [the arresting officer] had reasonable cause to believe plaintiff had been driving under the influence" and "it was not hearsay because it was not offered to prove the truth of the matter stated"]; *People v. Magana* (1979) 95 Cal.App.3d 453, 462 [an informant's statement is "being offered to establish that the affiant had a reasonable basis for *believing* the informer's statement to be true—whether in fact true or not—to justify the magistrate's finding of probable cause."]; Cal. Criminal Law (Cont.Ed.Bar 2017) Procedure and Practice, § 16.20, p. 421 ["Testimony offered only on the issue of probable cause, which would be hearsay if offered for the truth of the matter asserted, is not hearsay.  For example, if a police officer testifies to the reported description of an alleged robber, the testimony is not admitted to prove that the robber was as described; it is offered to show that the officer has probable cause to detain, search, or arrest the defendant."]; cf. *People v. Lucero* (1998) 64 Cal.App.4th 1107, 1110 [observing that the testimony deemed admissible in *King* is inadmissible as irrelevant " '[if] the legality of defendant's arrest was not in issue' "].)[6]

---

[6] *King* is cited with approval in another First District decision, *People v. Romeo* (2015) 240 Cal.App.4th 931, 946–947, although the decision describes the testimony at issue there as admissible hearsay, rather than as admissible non-hearsay.  (See i*bid.* ["The pertinent hearsay exception here is Evidence Code section 1250, subdivision (a)(1), the state-of-mind exception.  Under that exception, Officer Miller's testimony that he obtained information from the database was admissible to prove his receipt of information from an independent source."].)  That may be due to the fact that in *Romeo* the legality of the search depended on the actual scope of a probation search condition, rather than a determination of probable cause.

9

In the present case, Sergeant Maguire's testimony about how he obtained the surveillance videos and what he observed in the videos was not admitted to prove the videos depicted the robberies or to prove the content of the videos. Instead, the testimony was admitted to inform the trial court of the basis for Maguire's belief he had probable cause to arrest appellants. As explained below (Part I.D., *post*), the prosecution was required to show that information was sufficiently reliable to support an objectively reasonable finding of probable cause.

Appellants also contend the prosecution failed to demonstrate the surveillance videos that Sergeant Maguire described were authentic within the meaning of Evidence Code section 1400, which provides that "Authentication of a writing means (a) the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is or (b) the establishment of such facts by any other means provided by law." (See also *People v. Goldsmith* (2014) 59 Cal.4th 258, 266–267 (*Goldsmith*).) Video recordings are writings within the meaning of Evidence Code section 1400. (*Goldsmith*, at p. 267.) *Goldsmith* explains that "[a]uthentication is essentially a subset of relevance," because a writing cannot be treated as relevant to the issues in an action without some proof the writing is what it is purported to be. (*Ibid.*)

Although the prosecution was required to authenticate the videos Sergeant Maguire described in his testimony, "the proof that is necessary to authenticate a photograph or video recording varies with the nature of the evidence that the photograph or video recording is being offered to prove and with the degree of possibility of error." (*Goldsmith*, at p. 267.) *Goldsmith* further explains, "The purpose of the evidence will determine what must be shown for authentication, which may vary from case to case. [Citation.] The foundation requires that there be sufficient evidence for a trier of fact to find that the writing is what it purports to be, i.e., that it is genuine for the purpose offered." (*Ibid.*) "A photograph or video recording is typically authenticated by showing it is a fair and accurate representation of the scene depicted. [Citations.] This foundation may, but need not be, supplied by the person taking the photograph or by a person who

witnessed the event being recorded. [Citation.] It may be supplied by other witness testimony, circumstantial evidence, content and location." (*Id.* at pp. 267–268.)

In *Goldsmith*, the evidence at issue were photographs generated by a red light traffic camera, "offered as substantive proof of defendant's violation." (*Goldsmith*, *supra*, 59 Cal.4th at p. 267.) The authenticity of the photographs was supported in part by a statutory presumption that printed representations are " 'presumed to be an accurate representation of the images it purports to represent.' " (*Id.* at p. 268, quoting Evid. Code, § 1553, subd. (a).) The showing of authenticity was also supported by testimony from an officer who explained the operation of the camera system, *based on information he obtained from* city engineers and the company that maintained the camera. (*Goldsmith*, at pp. 264, 271.) Further, "the content of the photographs themselves may be considered and here the content supplied further support for a finding that the images were genuine." (*Id.* at p. 271.)

In the present case, Sergeant Maguire's testimony about the surveillance videos was only admitted for the purpose of establishing the information he relied on in arresting appellants.[7] With that purpose in mind, we turn to the prosecution's showing of authenticity. Sergeant Maguire testified under oath about surveillance videos of seven robberies. Maguire did not have personal knowledge of the robberies or how the videos were made, but there is little reason to doubt the videos depict the robberies under

_____

[7] We need not decide whether a greater showing of authenticity would be required to admit the videos as substantive evidence at trial, because the videos were relevant to the probable cause determination if they bore indicia of reliability (see Part I.D., *post*), even if (for some unlikely reason) the videos did not actually depict the charged robberies. (Cf. *Goldsmith*, *supra*, 59 Cal.4th at pp. 265–266, 271–272 [authentication of images from red light traffic camera at court trial on citation for running red light]; *People v. Chism* (2014) 58 Cal.4th 1266, 1304 [authentication of photographs from surveillance video at murder and robbery jury trial].) *People v. Collins* (1997) 59 Cal.App.4th 988, 994, and *People v. Romeo*, *supra*, 240 Cal.App.4th 931, upon which appellant Alexander relies, are also distinguishable. The searches in those cases were based upon a warrant (*Collins*) and a probation search condition (*Romeo*), and the validity of the searches turned on evidence of the existence and scope of the warrant and search condition, rather than a probable cause determination based on the information possessed by the officer. (*Collins*, at p. 994; *Romeo*, at p. 952.)

investigation.  Although the testimony was not detailed, Maguire explained, or it can reasonably be inferred, that he obtained the videos from other officers, from case files, or from the establishments that were robbed.  That the surveillance videos came from the robbery case files or were obtained from the locations of the robberies is circumstantial evidence that the videos depict the robberies under investigation.  (See *People v. Smith* (2009) 179 Cal.App.4th 986, 1002 [authenticity determination based in part on location of documents in defendant's office]; *People v. Gibson* (2001) 90 Cal.App.4th 371, 383 [authenticity determination based in part on discovery of documents in search of defendant's home]; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1373 [same].)  As to the Round Table and Subway robbery surveillance videos, Maguire testified the events depicted in the videos matched the descriptions of the incidents he heard from witnesses. Thus, the "content" (*Goldsmith*, *supra*, 59 Cal.4th at p. 268) of those two videos corresponded to the robberies.  The specific evidence authenticating those videos was "circumstantial evidence" (*ibid.*) that corroborated the authenticity of the other videos, which appeared to have been committed by the same suspects during the same time frame.  Photographs of stills from five of the videos were submitted into evidence; those images contained timestamps corresponding to the dates of the robberies[8] and corroborated Maguire's testimony by showing the videos he described did in fact exist. In other words, "the content supplied further support for a finding that" the videos depicted the robberies under investigation.  (*Id.* at p. 271.)  To conclude the videos did not correspond to the robberies, one would need to speculate that persons provided videos of *other* robberies to Maguire or that the videos were an elaborate fabrication.  The

---

[8] The one exception is exhibits 7 through 10, which depict the robbery at The Hot Tubs. That robbery occurred on September 8, 2012, but the timestamps say September 9. Although the discrepancy is unexplained, that does not undermine the fundamental reliability of the video, given the unlikelihood robberies occurred on two consecutive days.  The name "The Hot Tubs" is visible in exhibit seven, so there is no question the video came from that business.  Further, even if it were true that robberies occurred at The Hot Tubs on two consecutive days, this would not reduce the relevance of the surveillance video in creating probable cause to arrest the perpetrators of the robbery shown in the video.

implausibility of those scenarios reflects the low "degree of possibility of error" in the present case. (*Id.* at p. 267.) Whether or not Maguire's testimony would have been sufficient to authenticate the videos for admission at trial on the underlying charges (see fn. 7, *ante*), his testimony was a sufficient "prima facie" showing of authenticity for purposes of the hearing on the motion to suppress. (*Ibid.*)

Appellants also argue their counsel were ineffective in failing to object to Sergeant Maguire's testimony under Evidence Code section 1523, which provides that "oral testimony is not admissible to prove the content of a writing."[9] However, an objection on the basis of that section, an aspect of the secondary evidence rule, would have been misplaced, because Maguire's testimony was admitted to explain the basis for the arrests, not to prove the content of the videos. (Cf. *People v. Myers* (2014) 227 Cal.App.4th 1219, 1226 & fn 1 [testimony at robbery trial that video showed that store clerk raised his hands offered to show use of fear].) In any event, defense counsel might have had a tactical reason to avoid invoking Evidence Code section 1523. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267.) To wit, defense counsel may have preferred to avoid admission of the surveillance videos, which might have demonstrated even more clearly the objective reasonableness of the arrest. Without the videos themselves, the showing of reasonableness could only be based on Maguire's testimony and the stills from the videos, which were less conclusive than the videos would have been, assuming (as we must for purposes of the claim on direct appeal [see *ibid.*]) that appellants were the perpetrators in the videos.

Appellants have not shown the court erred in admitting the testimony of Sergeant Maguire at the hearing on the motion to suppress.[10]

---

[9] We reject appellant Farr's suggestion that his counsel *did* object on the ground of Evidence Code section 1523. The portion of the record cited by Farr does not indicate that counsel "fairly apprise[d]" the trial court of an objection under that provision or that court "understood [that] issue [to be] presented." (*People v. Scott* (1978) 21 Cal.3d 284, 290.)

[10] Appellant Farr also contends the trial court erred in limiting his counsel's cross-examination of Sergeant Maguire. Specifically, his counsel asked Maguire to re-confirm

13

D.    *Sergeant Maguire's Testimony Established Probable Cause*

Did the information possessed by Sergeant Maguire support a finding of probable cause to arrest appellants?  " 'Probable cause to arrest exists if facts known to the arresting officer would lead a person of ordinary care and prudence to entertain an honest and strong suspicion that an individual is guilty of a crime.' [Citation.]  '[T]he probable-cause standard' . . . 'is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances.' [Citation.]  ' "[T]he substance of all the definitions of probable cause is a reasonable ground for belief of guilt," ' and 'the belief of guilt must be particularized with respect to the person to be searched or seized. . . .' [Citation.]  In determining whether probable cause to make an arrest existed, 'we examine the events leading up to the arrest, and then decide "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to" probable cause. . . .' " (*People v. Turner* (2017) 13 Cal.App.5th 397, 404–405.)  To support a determination of probable cause, the information relied upon by the arresting officer must be " 'reasonably trustworthy' "

---

details about the suspects in the surveillance videos, such as that they were "two African-American males, one taller and thinner, and the other shorter and heavier."  The prosecutor objected, saying "asked and answered as to these specific videos."  The trial court sustained the objection, commenting "It is.  Let's move things something along.  If there's nothing new to add here or if there's some area or cross-examination that's going to be helpful to me.  But it doesn't help me to hear the same testimony over and over again."  Later, the court stated, "I think I've heard enough on re-cross from this witness," and Farr's counsel responded, "That's fine."  Farr has not shown error.  "The control of cross-examination is not only within the discretion of the trial court, but, in the exercise of that discretion, the court may confine cross-examination within reasonable limits and may curtail cross-examination which relates to matters already covered or which are irrelevant." (*People v. Beach* (1983) 147 Cal.App.3d 612, 628.)  The court told counsel she could explore any new areas and only indicated a desire not to hear the same testimony "over and over."  Counsel's comment ("[t]hat's fine") in acquiescing to ending cross-examination indicates she had nothing left of significance to ask Maguire.  The court did not abuse its discretion. (See *People v. Ayala* (2000) 23 Cal.4th 225, 301 ["the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance."].)

14

(*Hunter v. Bryant* (1991) 502 U.S. 224, 228) or bear "indicia of reliability" (*Illinois v. Gates* (1983) 462 U.S. 213, 233).

As explained previously in the context of the authentication analysis (Part I.C., *ante*), Sergeant Maguire's testimony established the videos were a trustworthy basis upon which to formulate probable cause for arrest. Although his testimony was not detailed, the videos as described had sufficient indicia of reliability and there is little reason to doubt the videos depicted the robberies under investigation. We need not repeat the analysis here.

Appellants also argue Sergeant Maguire could not make a sufficiently reliable identification of them based on his viewings of the surveillance videos. They rely on *People v. Walker* (2012) 210 Cal.App.4th 1372, in which the court of appeal held that a deputy's opinion that the defendant, detained at a public transit station, resembled a suspect was not "objectively reasonable." (*Id.* at p. 1387.)[11] *Walker* is distinguishable. There, the only similarities were in the race and age of the defendant and the suspect, because the photographs of the suspect relied upon by the deputy were "of poor quality and offer little objective support for [the deputy's] testimony." (*Id.* at p. 1386.) In the present case, we agree with the trial court that, comparing the surveillance stills to the photographs taken the day of the arrest, exhibits one and two are reasonably recognizable as Alexander and exhibits nine and ten are reasonably recognizable as Farr. Although the quality of the surveillance video stills is not so good as to leave no doubt, we agree with the trial court that it is reasonable to infer that Maguire's ability to recognize appellants was enhanced by his multiple viewings of the videos. Also, the circumstances that Maguire encountered appellants together and that Alexander was wearing the same jacket and shoes he wore in some of the videos substantially enhanced the probable accuracy of the identification. Considered as a totality, the information known to Maguire was

---

[11] Appellant Alexander's citations to cases regarding testimony *at trial* identifying a person in a photograph or video as the defendant are inapposite to the probable cause issue in this case. (*People v. Larkins* (2011) 199 Cal.App.4th 1059, 1065–1066; *People v. Mixon* (1982) 129 Cal.App.3d 118, 127.)

sufficient; certainty in the identification was not required to support a determination of probable cause. (*People v. Turner*, *supra*, 13 Cal.App.5th at pp. 404–405.)

Appellants also contend the trial court, in upholding the warrantless arrest, could not rely on Sergeant Maguire's testimony about the Sweet Chinito robbery broadcast. They rely on the "*Harvey-Madden* rule,"[12] pursuant to which, when " ' "officers in the field . . . make arrests on the basis of information furnished to them by other officers," ' " then " ' "the People must prove that the source of the information is something other than the imagination of an officer who does not become a witness." ' " (*People v. Collins*, *supra*, 59 Cal.App.4th at p. 993; see also *People v. Brown* (2015) 61 Cal.4th 968, 983 (*Brown*).) We need not address that claim because, like the trial court, we do not rely on the dispatch in finding probable cause for the warrantless arrest. As we have explained, Maguire had probable cause to arrest appellants because he recognized them from the surveillance videos; his testimony about the Sweet Chinito robbery dispatch merely explained why he went to the area of Market and 7th Street the day of the arrest.

Because the surveillance videos viewed by Sergeant Maguire bore indicia of reliability and because those videos provided a sufficient basis for him to recognize appellants, the warrantless arrest of appellants was objectively reasonable under the Fourth Amendment.[13]

II.     *The Trial Court Did Not Err in Its Conduct Credits Calculation*

---

[12] *People v. Harvey* (1958) 156 Cal.App.2d 516 and *People v. Madden* (1970) 2 Cal.3d 1017.

[13] The result in this case is consistent with the underlying objectives of the probable cause standards. As explained in *Brinegar v. United States*, *supra*, 338 U.S. at page 176, the standards "seek to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime. They also seek to give fair leeway for enforcing the law in the community's protection. Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable [people], acting on facts leading sensibly to their conclusions of probability. The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice."

16

Section 2933.1, subdivision (a) provides, "Notwithstanding any other law, any person who is convicted of a felony offense listed in subdivision (c) of Section 667.5 shall accrue no more than 15 percent of worktime credit, as defined in Section 2933." Section 2933.1, subdivision (c) provides, "Notwithstanding Section 4019 or any other provision of law, the maximum credit that may be earned against a period of confinement in, or commitment to, a county jail, . . . following arrest and prior to placement in the custody of the Director of Corrections, shall not exceed 15 percent of the actual period of confinement for any person specified in subdivision (a)." The limitation in section 2933.1, subdivision (c) applied to the credits calculation for the time appellants were in jail custody, because section 667.5, subdivision (c)(9) defines "[a]ny robbery" as a " 'violent felony.' " (See also *People v. Ramos* (1996) 50 Cal.App.4th 810, 815–820 (*Ramos*).)

For the 1,741 days served in jail before sentencing, appellant Alexander received conduct credit of 261 days, which is 15 percent of the actual period of confinement. (§ 2933.1, subd. (c). He contends he should have received conduct credit of 307 days, which would result in a 15 percent reduction of the sentence imposed by the trial court.[14] The *Ramos* court rejected a similar claim. There, the court construed section 2933.1, subdivision (c), to cap conduct credits at 15 percent of the days in confinement, stating the "provision plainly looks to the number of days an unsentenced defendant actually spends in local custody rather than to some hypothetical term of confinement." (*Ramos*, *supra*, 50 Cal.App.4th at p. 819.) The court was aware of the disparity highlighted by appellants in the present case between jail and prison conduct credit awards, because the defendant there argued, "the method [the court] used to calculate presentence conduct credits violates equal protection principles in that it causes a person such as Ramos, who is confined in the county jail prior to sentencing, to earn fewer conduct credits than a person who receives the same sentence but serves the entire term in prison." (*Id.* at p. 817.) As *Ramos* explained, "the disparity arises because the conduct credits one earns in

---

[14] Appellant Farr, who received the same credits as Alexander, joins in the claim.

17

prison are based on the total term of imprisonment whereas, under the method employed here, credits earned prior to sentencing are based on the actual period of confinement." (*Id.* at p. 818.) *Ramos* rejected the equal protection claim, reasoning that "a violent felon confined in a local detention facility prior to sentencing is not similarly situated for equal protection purposes to one serving a term in state prison and enrolled in a qualifying work program." (*Id.* at p. 824.)

Appellant Alexander contends the *Ramos* court erred, and he discusses in great detail various aspects of the legislative history that he argues show "subdivision (c) of section 2933.1 was intended to combine with subdivision (a) to limit the conduct credit on the entire prison term for a violent felony to 15 percent regardless of the amount of time the defendant happened to serve in county jail before the sentence. It was not intended to create a limit on the conduct credit for the time served in county jail that was even harsher than that for the time served in prison."

We believe the evidence of legislative intent highlighted by appellants is ambiguous as to the interpretation of section 2933.1, subdivision (c). In any event, we need not consider the legislative history because we agree with the *Ramos* court that the statute unambiguously requires courts to look to "the number of days an unsentenced defendant actually spends in local custody." (*Ramos*, *supra*, 50 Cal.App.4th at p. 819.)[15] Appellants have not proffered a reasonable alternate interpretation of the phrase "the actual period of confinement" (§ 2933.1, subd. (c)) and we are not at liberty to substitute our policy judgment for the plain language of the statute. (*Sierra Club v. Superior Court* (2013) 57 Cal.4th 157, 165–166 [" 'If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy.' "].) Neither have appellants shown the plain language interpretation of 2933.1, subdivision (c) leads to an absurd result. As explained in

_____

[15] Because we do not rely on the legislative history, we deny appellant Alexander's January 23, 2018 request for judicial notice of that history.

18

*Ramos*, persons confined in jail before sentencing and prison inmates are not identically situated (*Ramos*, at pp. 822–824), and we cannot say it is absurd to "calculate a violent felon's presentence conduct credits based on a slightly less generous formula than is used to determine his or her prison conduct credits." (*Id.* at p. 820.)

Appellants have not shown the trial court erred in calculating conduct credits for time they spent in jail custody. Of course, the Legislature is at liberty to amend section 2933.1, subdivision (c) if the language it enacted fails to effectuate the intended policy.

III.     *We Remand for Exercise of Trial Court's Newly-Granted Sentencing Discretion*

Finally, appellant Alexander contends this matter must be remanded for resentencing so the trial court may exercise its newly-granted discretion to dismiss or strike the five-year consecutive term that was imposed based on his prior serious felony conviction for attempted robbery. (§ 667, subd. (a).) That discretion was granted in 2018's Senate Bill 1393 (SB 1393); the Legislature granted similar discretion with respect to firearm enhancements in 2017's Senate Bill 620 (SB 620). Recent decisions in this District have disagreed whether appellants who pled guilty pursuant to plea agreements with agreed upon sentences are entitled to resentencing to permit trial courts an opportunity to exercise the discretion granted under those enactments. (Compare *People v. Galindo* (2019) 35 Cal.App.5th 658 [Division One opinion rejecting claim under SB 1393 and dismissing appeal], *People v. Fox* (2019) 34 Cal.App.5th 1124 (*Fox*) [Division One majority rejecting claim under SB 620 and dismissing appeal], and *People v. Stamps* (2019) 34 Cal.App.5th 117 (*Stamps*), review granted June 12, 2019, S255843 [Division Four decision remanding for exercise of trial court's discretion under SB 1393].) We conclude appellant Alexander is entitled to a remand for resentencing under SB 1393.[16]

---

[16] Appellant Alexander was not required to obtain a certificate of probable cause to assert this claim. First and most clearly, because providing appellant the relief requested would not invalidate the plea, the appeal is not "in substance . . . an attack on the validity of the plea." (*People v. Buttram* (2003) 30 Cal.4th 773, 782; see *Stamps*, *supra*, 34 Cal.App.5th at pp. 121–122, review granted; *People v. Hurlic* (2018) 25 Cal.App.5th 50, 54–59 (*Hurlic*).) Second, we question whether the appeal would require a certificate of

"On September 30, 2018, the Governor signed [SB 1393] which, effective January 1, 2019, amend[ed] sections 667[ subdivision (a)] and 1385[ subdivision (b)] to allow a court to exercise its discretion to strike or dismiss a prior serious felony conviction for sentencing purposes. (Stats. 2018, ch. 1013, §§ 1–2.)" (*People v. Garcia* (2018) 28 Cal.App.5th 961, 971.) Under the previous version of the statutes, a trial court was "required to impose a five-year consecutive term for 'any person convicted of a serious felony who previously has been convicted of a serious felony' (§ 667[, subd. (a)]), and the court ha[d] no discretion 'to strike any prior conviction of a serious felony for purposes of enhancement of a sentence under Section 667.' " (*Garcia*, at p. 971.) *Garcia* held SB 1393 "applies retroactively to all cases or judgments of conviction in which a five-year term was imposed at sentencing, based on a prior serious felony conviction, provided the judgment of conviction [was] not final when SB 1393 [became] effective on January 1, 2019." (*Garcia*, at pp. 971–972.)

Respondent agrees SB 1393 is retroactive, but it argues remand for resentencing would be futile because the trial court "lacks any authority to later unilaterally alter any component of the plea" bargain entered by the parties and approved by the court.[17] It relies on the proposition that "a negotiated plea agreement is in the nature of a contract,"

probable cause even if appellant Alexander is not entitled to the relief requested; a conclusion that appellant's statutory interpretation is incorrect does not transform his appeal into an attack on the validity of the plea. (But see *Fox*, *supra*, 34 Cal.App.5th 1124, 1139.) Finally, we agree with the dissent in *Fox* that "[A] plea agreement is deemed to incorporate changes in the law such as [SB 1393] that are intended to apply to the parties. [Appellant Alexander's] appeal, which seeks resentencing to allow the trial court to exercise its discretion consistent with the new legislation, is not an attack on the validity of the plea itself but rather an effort to raise issues *reserved* by the plea agreement, and as to which [appellant] did not waive his right to appeal. [Citation.] No certificate of probable cause was required under the circumstances." (*Fox*, at p. 1144 (dis. opn. of Sanchez, J.).)

[17] We reject respondent's separate contention that remand is unnecessary because "the record shows that the trial court clearly indicated when it originally sentenced the defendant that it would not in any event have stricken" (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 425) the prior serious felony conviction for sentencing purposes. Respondent points to nothing in the record that "reveals a clear indication of how the court would have exercised its discretion." (*Id.* at p. 426.)

and "when the trial court accepts it, the agreement is binding on the parties and the court." (*People v. Martin* (2010) 51 Cal.4th 75, 80.)

That argument was rejected by the Second District in analogous circumstances in *Hurlic*, *supra*, 25 Cal.App.5th 50. (See also *Stamps*, *supra*, 34 Cal.App.5th at p. 121, review granted [following *Hurlic* in SB 1393 context].) *Hurlic* involved 2017's SB 620, which granted trial courts discretion to strike section 12022.53 firearm enhancements. (*Hurlic*, at p. 54.) That bill, like SB 1393, was deemed retroactive, and *Hurlic* concluded remand was necessary to allow the trial court to exercise its newly granted discretion, even though the sentence below was based on an agreed-upon sentence. (*Hurlic*, at pp. 56, 57–59.) *Hurlic* acknowledged the contractual nature of plea bargains, but observed that, "[u]nless a plea agreement contains a term requiring the parties to apply only the law in existence at the time the agreement is made, . . . 'the general rule in California is that the plea agreement will be " 'deemed to incorporate and contemplate not only the existing law but the reserve power of the state to amend the law or enact additional laws for the public good and in pursuance of public policy.' " ' " (*Id.* at p. 57, quoting *Doe v. Harris* (2013) 57 Cal.4th 64, 66.) Because the defendant's plea bargain did not contain language to the contrary, it was deemed to incorporate SB 620 and "thus give defendant the benefit of its provisions without calling into question the validity of the plea." (*Hurlic*, at p. 57.) If on remand the trial court were to strike the 20-year firearm enhancement at issue in that case, "resentencing under [SB] 620 still [would] not 'eviscerate[ ] . . . the plea bargain' . . . , and thus, the People may not seek to set aside the plea." (*Hurlic*, at p. 57.)

In *Stamps*, *supra*, 34 Cal.App.5th 117, Division Four of this District followed *Hurlic* in the context of SB 1393. Citing *Hurlic* and the California Supreme Court decisions underlying the decision, *Stamps* rejected the Attorney General's argument "that retroactive application of new law in this case would deprive the prosecution of the benefit of its plea bargain." (*Stamps*, at p. 122, review granted; see also *Doe v. Harris*, *supra*, 57 Cal.4th at pp. 73–74 ["It follows, also as a general rule, that requiring the parties' compliance with changes in the law made retroactive to them does not violate the

21

terms of the plea agreement, nor does the failure of a plea agreement to reference the possibility the law might change translate into an implied promise the defendant will be unaffected by a change in the statutory consequences attending his or her conviction. To that extent, then, the terms of the plea agreement can be affected by changes in the law."].) *Stamps* declined to follow the Second District's decision in *People v. Kelly* (2019) 32 Cal.App.5th 1013, review granted June 12, 2019, S255145, which concluded retroactive application of SB 1393 to a stipulated sentence would be a " 'bounty in excess of that to which [the defendant] is entitled.' " (*Kelly*, at p. 1018, review granted.) *Stamps* observed that the *Kelly* decision "failed to consider the reasoning on which *Hurlic* is based, and it failed to cite or consider" the precedents underlying *Hurlic*. (*Stamps*, at p. 124, review granted.) We agree with the reasoning in *Hurlic* and *Stamps*.

Very recently, in *Fox*, *supra*, 34 Cal.App.5th 1124, the majority of a panel in Division One of this District declined to follow *Hurlic* or *Stamps* in the SB 620 context. The majority concluded the Legislature did not "intend[] for a trial court to be able to exercise sentencing discretion under [SB] 620 even when a defendant agrees to serve a specific term for a firearm enhancement and does not seek to withdraw the plea." (*Fox*, at p. 1137.) Although the decision's analysis is thoughtful, we find more persuasive the dissenting justice's observation that SB 620 "requires only that the trial court exercise its discretion to decide whether to strike a firearm enhancement, in full view of the circumstances that gave rise to the plea agreement and in accordance with the equities of the situation and the interests of justice." (*Fox*, at p. 1140 (dis. opn. of Sanchez, J.).) The *Fox* dissent also observed that, in enacting SB 620, "the Legislature was grappling with the large-scale impacts of mandatory firearm enhancements on lengthy prison sentences, prison crowding, and incarceration costs." (*Fox*, at pp. 1148–1149 (dis. opn. of Sanchez).) SB 1393 was enacted for similar reasons. (See, e.g., Sen. Comm. on Pub. Saf. report on SB 1393, April, 3, 2018 [bill author's statement that lack of discretion "has resulted in mandatory additional terms for thousands of individuals incarcerated throughout California's prisons. This rigid and arbitrary system has meted out punishments that are disproportionate to the offense, which does not serve the interests of

justice, public safety, or communities."].)  In the event a trial court on remand were to conclude it is in the interests of justice to strike an enhancement included in a stipulated sentence plea, we believe it would be consistent with the Legislature's intent for the court to do so without invalidating the plea.

Respondent does not claim appellant Alexander's plea bargain "contain[s] a term incorporating only the law in existence at the time of execution." (*Hurlic*, *supra*, 25 Cal.App.5th at p. 57.)  Accordingly, under *Stamps* and by analogy to *Hurlic* and the California Supreme Court decisions relied upon therein, appellant Alexander's plea bargain is deemed to incorporate SB 1393 and remand is required to give the trial court an opportunity to exercise its newly granted discretion to strike Alexander's prior serious felony conviction for sentencing purposes.  "In exercising its discretion, the trial court is not precluded from considering whether doing so would be incompatible with the agreement on which defendant's plea was based.  If the trial court strikes the enhancement, it shall resentence defendant [Alexander].  In selecting an appropriate sentence, the court retains its full sentencing discretion except that it may not impose a term in excess of the negotiated [14] years without providing defendant [Alexander] the opportunity to withdraw his plea.  [Citation.]  If the trial court does not strike the enhancement, it shall reinstate the sentence." (*Stamps*, *supra*, 34 Cal.App.5th at p. 124, review granted.)  If the court decides to resentence Alexander without the five-year enhancement under section 667, subdivision (a), respondent may *not* seek to set aside the plea. (*Hurlic*, at p. 57.)

DISPOSITION

The trial court's judgment is affirmed as to appellant Farr.  As to appellant Alexander, the case is remanded for the trial court to consider whether to strike the five-year enhancement imposed under section 667, subdivision (a)(1).  If the trial court decides not to strike the enhancement, it is directed to correct the abstract of judgment to reflect that the enhancement is pursuant to section 667, subdivision (a)(1), rather than section 667.5, subdivision (a).  The clerk of the superior court is ordered to forward a

certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.  The judgment as to appellant Alexander is affirmed in all other respects.

_____

SIMONS, J.

I concur.

_____

JONES, P.J.

(A151809, A152247)

I concur with the majority opinion, except to the extent it remands the matter for Alexander to be resentenced pursuant to Senate Bill 1393 (SB 1393). (Sen. Bill No. 1393 (2017–2018 Reg. Sess.) § 667.) That issue is not properly before us, because Alexander did not obtain a certificate of probable cause.

It is fundamental that an appellant who challenges the validity of his or her plea must first obtain a certificate of probable cause from the trial court. (*People v. Panizzon* (1996) 13 Cal.4th 68, 76; Pen. Code, § 1237.5.) Where the appellant seeks to change a sentence that the parties had agreed would be imposed as part of the plea bargain, the appellant is in substance challenging the plea's validity and a certificate of probable cause is required. (E.g., *Panizzon, supra*, 13 Cal.4th at p. 78; *People v. Cuevas* (2008) 44 Cal.4th 374, 381–382.)

Here, Alexander's plea was part of an agreement by which the court would impose, and did impose, a specific sentence of 14 years, including five years for his prior conviction of attempted robbery (Pen. Code, § 667, subd. (a)(1)). ~(CT 421-422, 439)~ Alexander now wants us to remand the case so the trial court can strike or dismiss his prior felony conviction pursuant to SB 1393 and give him a sentence less than that to which he stipulated in his plea agreement. (See Pen. Code, § 667, subd. (a); § 1385, subd. (b).) Alexander is plainly attacking the validity of his plea, and a certificate of probable cause is necessary.

The majority states in a footnote that Alexander was not required to obtain a certificate of probable cause, theorizing that his request for relief does not really attack the plea's validity. (Maj. opn. ante, at p. 20, fn. 16.) The majority cites *People v. Buttram* (2003) 30 Cal.4th 773, 782 (*Buttram*), but *Buttram* affirms the principle that a certificate *is* required where, as here, the appellant attacks a specific sentence to which the parties agreed. (*Id*. at pp. 781–782, 789.) While *Buttram* further concluded that a certificate of probable cause was not needed to challenge the court's *exercise of*

1

*discretion* in selecting a sentence *within* an agreed maximum, that is not at issue here. (*Id*. at pp. 785–789.)

The majority also cites *People v. Stamps* (2019) 34 Cal.App.5th 117 (*Stamps*), involving SB 1393, and *People v. Hurlic* (2018) 25 Cal.App.5th 50, 54–59 (*Hurlic*), a case involving Senate Bill 620 (SB 620) on which *Stamps* heavily relied. Both *Stamps* and *Hurlic* acknowledged that a certificate of probable cause is required when an appellant challenges a specific negotiated sentence, but nonetheless concluded that this mandate can be ignored when the challenge is based on a retroactive change in the law. (*Stamps*, at p. 121; *Hurlic*, at pp. 55-57.)

The retroactivity analysis of *Stamps* and *Hurlic* does not persuade me. It implies that, even though a certificate of probable cause is mandated for attacks on plea bargains reached after the effective date of SB 1393 (or SB 620), no certificate would be needed for attacks against plea bargains reached before the law was even in existence. This would be a curious result, which *Stamps* and *Hurlic* do not adequately explain.

In my view, *Stamps* and *Hurlic* overstate the consequence of retroactivity. Although a new statute may apply retroactively to cases not yet final, that does not mean that every case not yet final falls within the scope of the new statute. Here, SB 1393 applies retroactively, but there is no indication that it was intended to govern cases in which, as here, the defendant had agreed to a conditional plea that mandated a specific sentence *without* judicial discretion to change it. (See *People v. Segura* (2008) 44 Cal.4th 921, 923 [trial court may not change the sentence stipulated in a conditional plea without the consent of both parties].) Moreover, even if a law applies retroactively, it does not follow that a person using that law to challenge a stipulated sentence is immune from having to obtain a certificate of probable cause.

*Stamps*'s and *Hurlic*'s primary justification for their retroactivity analysis borrows from the idea that new laws are sometimes incorporated into old plea agreements. (*Stamps, supra*, 34 Cal.App.5th at p. 121; *Hurlic, supra*, 25 Cal.App.5th at p. 57.) As the

2

argument goes, unless a plea agreement explicitly requires the parties to apply only the law in existence when the agreement is made, " 'the general rule in California is that the plea agreement will be " 'deemed to incorporate and contemplate not only the existing law but the reserve power of the state to amend the law or enact additional laws for the public good and in pursuance of public policy.' " ' " (*Hurlic, supra*, 25 Cal.App.5th at p. 57, quoting *Doe v. Harris* (2013) 57 Cal.4th 64, 66 (*Doe*).) Relying on *Doe* and *Harris v. Superior Court* (2016) 1 Cal.5th 984 (*Harris*), *Hurlic* concluded that the subject plea agreement was " 'deemed to incorporate' the subsequent enactment of [SB 620], and thus give defendant the benefit of its provisions without calling into question the validity of the plea." (*Hurlic, supra*, 25 Cal.App.5th at p. 57.)

However, the cases on which *Hurlic* relied are inapposite. Besides the fact that neither of them addressed the certificate of probable cause requirement, the plea agreements in those cases were deemed to incorporate substantive changes in the law, which the Legislature explicitly made applicable to the defendants. (*Doe, supra*, 57 Cal.4th at p. 66; *Harris, supra*, 1 Cal.5th at p. 991.) Here, SB 1393 merely allows a court to exercise its discretion to strike or dismiss a prior serious felony conviction for sentencing purposes. (*People v. Garcia* (2018) 28 Cal.App.5th 961, 971.) SB 1393 does not require all prior serious felony convictions to be stricken for sentencing; nor does it expressly make its provisions applicable to persons convicted pursuant to a plea bargain that was conditioned on the court entering a specified sentence, and only that sentence.

This distinction makes a difference, as recently explained in two cases from this appellate district that rejected *Hurlic*'s and *Stamps*'s analysis. (*People v. Galindo* (2019) 35 Cal.App.5th 658 (*Galindo*); *People v. Fox* (2019) 34 Cal.App.5th 1124 (*Fox*).) As *Fox* concluded, "the general rule that plea agreements incorporate subsequent changes in the law pertains only to changes that the Legislature or electorate ' "intended to apply to" ' the parties to plea agreements," and there is no indication that SB 620 was intended to apply to plea bargains in which the defendant and the prosecution stipulated that a

3

specific sentence would be entered in exchange for the dismissal of other counts, rights, or remedies. (*Fox*, at pp. 1135–1136.) *Galindo* reached the same conclusion as to SB 1393, and so do I. (*Galindo*, at pp. 671–672.)

As another reason for eschewing the certificate of probable cause requirement, *Hurlic* asserted that the intent behind the requirement is to encourage plea agreements and weed out frivolous and vexatious appeals, and a defendant's incentive to plead is reduced if the defendant must seek a certificate of probable cause to take advantage of a new law. (*Hurlic, supra*, 25 Cal.App.5th at pp. 57–58.) I find it difficult to believe that a defendant, content with serving a specified number of years to avoid trial and the potential for additional convictions and a longer sentence, would shun the deal merely because, if in the future some change in the law would shave even more years off his sentence, he would have to file a piece of paper stating why the new law applies (which he would have to establish eventually anyway). (See *Galindo, supra*, 35 Cal.App.5th at p. 672.) And if, as *Galindo* concludes, SB 1393 was *not* intended to apply to convictions obtained by conditional plea (*id.* at p. 671), the gatekeeping function of Penal Code section 1237.5 can only be fulfilled if the certificate of probable cause requirement is imposed.

Lastly, *Hurlic* asserted that the more specific and newer legislation (in this case, SB 1393) should prevail over the more general and older Penal Code section 1237.5. (*Hurlic, supra*, 25 Cal.App.5th at p. 58.) However, those rules of construction apply only if there is no other way to harmonize conflicting statutes. Here, if there is any conflict between the certificate of probable cause requirement and the retroactive application of SB 1393, the conflict is readily harmonized: SB 1393 applies retroactively, but not to convictions by plea bargains in which a condition of the plea was the specific sentence the defendant received. After all, it is one thing to allow the court to exercise its discretion when the parties had agreed that the sentence would be left to the court's discretion; it is quite another to give the court discretion to change the sentence when the

4

parties had agreed that only one sentence was acceptable. (See *Buttram, supra*, 30 Cal.4th at pp. 786, 789 ["when the claim on appeal is merely that the trial court abused the discretion *the parties intended it to exercise*" in sentencing, there is no attack on the validity of the plea; but if it challenges a sentence that the parties agreed must be entered as a condition of the plea, appellant is attacking the validity of the plea], italics added.) *Hurlic* provides no basis for the majority's ruling in this case.

The majority's footnote in this case also expresses its agreement with the dissent in *Fox*, to the effect that Alexander is merely trying to " 'raise issues *reserved* by the plea agreement.' " (Maj. opn. ante, at p. 20, fn. 16, quoting *Fox, supra*, at p. 1144 (Sanchez, J., dissenting).) But that proposition is incorrect, since Alexander's conditional plea agreement did *not* reserve discretion to the trial court to change the length of his sentence. Indeed, it is the whole point of a conditional plea, as well as the expectation of the parties who negotiate them, that the court would not have such discretion. In my view, before we jump to the conclusion that the Legislature intended to flip the long-standing law and its real-world application on its head, wisdom dictates that we require something more from the legislative language than silence. I therefore agree not with the dissent in *Fox*, but with the views of the justices who formed the majority in *Fox*, as echoed by the unanimous panel in *Galindo*.[18]

Alexander's insistence that the court should be allowed to change his sentence under SB 1393 attacks the validity of his plea, and his argument cannot be heard without a certificate of probable cause. (Cal. Rules of Court, rule 8.304(b).)

---

[18]   The majority's footnote in this case also questions whether Alexander's appeal would require a certificate of probable cause even if he is not entitled to a remand for resentencing, because "a conclusion that appellant's statutory interpretation is incorrect does not transform his appeal into an attack on the validity of the plea." (Maj. opn. ante, at p. 20, fn. 16.) My point, however, is not that Alexander needs a certificate of probable cause because he is wrong in his interpretation of the statute, but because his request for relief attacks the validity of his plea.

5

NEEDHAM, J.

(A151809, A152247)

Superior Court of the City and County of San Francisco, Nos. SCN220303-01 & SCN220303-02, Hon. Jeffrey S. Ross, Judge.

Michael S. McCormick, under appointment by the Court of Appeal, for Defendant and Appellant Bryan Alexander.

Gail E. Chesney, under appointment by the Court of Appeal, for Defendant and Appellant Ray A. Farr.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Seth K. Schalit and Lisa Ashley Ott, Deputy Attorneys General, for Plaintiff and Respondent.