Filed 6/28/21  P. v. Paschall CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br>v.<br>LAMAR S. PASCHALL,<br><br>　　　Defendant and Appellant. | A155545<br><br>(San Francisco County<br>Super. Ct. No. 221383-02) |

Defendant Lamar Paschall and Kenneth Babers committed a brutal series of sexual crimes against Amber S. (Amber) and then robbed her by forcing her to withdraw money from an ATM.  A jury found Paschall guilty of numerous crimes arising out of the incident, including kidnapping to commit robbery.  Paschall argues that substantial evidence does not support the jury's guilty verdict on the kidnapping to commit robbery charge, specifically that two separate elements of that crime are not supported.  He also argues that the trial court erred by refusing to allow his counsel to cross-examine Amber regarding whether she had a mental or psychological disorder that would have interfered with her ability to perceive or recall the incident.  We reject the arguments, and affirm.

# BACKGROUND

## The General Setting

At around 1:30 a.m. on January 5, 2002, Amber—then 20 years old—finished working her shift at Trader Joe's on Bryant Street in San Francisco. She then had donuts and tea with a coworker, Phoebe Hunter, at a donut shop at 11th and Market Street. After a couple hours, Amber left and began walking home alone up Polk Street.

As she walked, Amber encountered two men, whom she later identified as Paschall and Babers. Amber began talking with the men and agreed to smoke marijuana with them. Amber and the men then went to a more secluded location, a loading dock in a nearby alley, Elm Street. They smoked marijuana and talked for 10 or 15 minutes.

After they finished smoking, Paschall grabbed Amber's face and forced her to perform oral sex on Babers. Paschall told Amber that Babers had a gun. Paschall and Babers went on to commit a series of sexual crimes against Amber, both individually and jointly, the details of which are not germane to the issues here, and need not be set out in detail. Suffice to quote the trial court's description in ruling on an issue at trial: "Amber was sodomized, orally penetrated, anally penetrated, and vaginally penetrated many times by two men at the same time." At one point during the attacks, Paschall told Amber "[s]hut up or I'll kill you." At another point, Amber vomited.

As discussed in greater detail below, after the attacks ended Paschall and Babers "decided that [the three of them] should walk specifically back to the little plaza area in between the quad and City Hall." Paschall and Babers were discussing "should they kill me, what should they do with me," Paschall at one point saying they would "off" her. At some point Paschall

2

"indicated" that they should go to an ATM. Amber chose a Wells Fargo ATM next to the library that she knew was closed. She tried two ATMs at that location but was unable to withdraw any cash because the ATMs there do not work at night.

Amber and the two men then went to a Washington Mutual ATM near Market and Eighth Street. Paschall hung "behind a little bit" while Babers accompanied Amber to the ATM, where she withdrew $80. After giving the men the $80, Paschall told her to go back to the ATM and get more. Amber returned to the ATM and withdrew another $60. The three then continued to walk on Market Street toward Sixth Street so that Paschall and Babers could buy drugs. After an unsuccessful attempt to buy cocaine, the men purchased marijuana and went to a donut shop on Sixth Street to buy rolling papers. Amber and Babers went inside the shop while Paschall waited outside. Inside the shop, Amber was able to signal to another customer that she had been raped and needed help. Employees of the shop brought Amber behind the counter and called the police, who arrived and took Amber to the hospital. Meanwhile, Babers left the shop and he and Paschall evidently left the area.

Later that year, Amber was walking around San Francisco with Hunter when she saw Paschall and Babers. Described as "shocked and frozen," Amber alerted Hunter and they ducked into a store. As Hunter put it at trial, she and Amber were walking when Amber, "scared, anxious, upset, [and] jittery," pulled Hunter into a coffee shop and said she "had seen the guys, that was them."

Over the following years, Amber failed to respond to repeated attempts by investigators to contact her. However, in 2011, after receiving a letter stating that the statute of limitations was approaching, she spoke with the

3

police, and following Amber's identification in a line-up, Paschall was arrested.

**The Proceedings Below**

On December 10, 2013, the San Francisco District Attorney filed an indictment charging Babers and Paschall with numerous crimes arising out of the incident. Paschall was charged with oral copulation by acting in concert with force (Pen. Code, § 288a, subd. (d)(1))[1] (count 2), four counts of forcible rape in concert (§ 264.1) (counts 3, 4, 9, and 10), forcible digital penetration in concert (§ 264.1) (count 6), forcible sodomy in concert (§ 286, subd. (d)(1)) (count 8), kidnapping to commit robbery at the Wells Fargo ATM (§ 209, subd. (b)(1)) (count 12), kidnapping to commit robbery at the Washington Mutual ATM (§ 209, subd. (b)(1)) (count 13), attempted first-degree robbery at the Wells Fargo ATM (§§ 212.5, subd. (b), 664) (count 14), and two counts of first-degree robbery at the Washington Mutual ATM (§ 212.5, subd. (b)) (counts 15 and 16). And with respect to the seven sexual assault charges (counts 2–4, 6, and 8–10), the indictment alleged that Paschall kidnapped Amber (§ 667.61, subd. (e)(1)).[2]

Jury trial was held in January of 2018, presided over by the Honorable Jeffrey Ross, in advance of which counts 14, 15, and 16 were dismissed as barred by the statute of limitations. The parties stipulated that Babers had raped Amber on Elm Street in the early morning hours of January 6, 2002,

---

[1] Further statutory references are to the Penal Code.

[2] Babers was charged individually in counts 1, 5, 7, 11, and 17–34. He accepted a plea bargain prior to trial and Paschall was subsequently tried alone.

and later pleaded guilty to that rape. The jury found Paschall guilty on seven counts: 2–4, 6, 8, 9 and 12. The jury found Paschall not guilty on count 10, but guilty of the lesser-included offense of assault with intent to commit rape (§ 220). The jury deadlocked nine-to-three in favor of guilt on count 13, as to which Judge Ross declared a mistrial. The jury also found not true the kidnapping allegations as to the sexual assault charges.

Paschall moved for a new trial in part on the basis that there was insufficient evidence to support the kidnapping conviction because the evidence showed he formed the intent to rob Amber only "*after the inception of the movement* away from the loading dock." Judge Ross denied the motion, noting among other things that there was "a lot of evidence presented showing clear intent to rob Amber prior to relevant asportation. This robbery was not an afterthought. . . . They knew of her ATM card, and they specifically took her to an ATM machine." And he later added, "[w]ith regard to the kidnapping, the evidence is clear that upon first abducting her—excuse me—first attacking her, the defendants obtained various ATM cards. And when they finished their sexual assault, then used the ATM cards to transport her to the banks whose ATMs could be accessed by use of those cards—clearly, circumstantial evidence to support each of the prerequisites of 1203 CALCRIM and the charge for which Mr. Paschall was convicted in Count 12."

Judge Ross sentenced Paschall to 36 years 4 months to life in prison, calculated as follows: seven years on count 2, seven years on count 3, 28 months on count 4, 28 months on count 6, seven years on count 8, 28 months on count 9, 16 months on count 10, and seven years to life on count 12, all to run consecutively.

## DISCUSSION

### The General Law and the Standard of Review

The aggravated offense of kidnapping with intent to commit robbery (§ 209) requires six elements, two of which are at issue here: (1) "that the defendant have the specific intent to commit a robbery at the time the kidnapping begins" (*People v. Davis* (2005) 36 Cal.4th 510, 565–566), and (2) the movement must have increased the risk of harm to the victim beyond that necessarily present in the robbery. (See CALCRIM No. 1203; *People v. Tribble* (1971) 4 Cal.3d 826, 832.)

In *People v. Tribble*, *supra*, 4 Cal.3d 826, our Supreme Court elaborated on this intent element, explaining that under section 209 it is " 'necessary for the trier of fact to determine whether the kidnap[p]er intended to commit robbery at the time of the original seizing. In this respect the crime is similar to burglary where it is necessary to show that the entry was with the intent to commit larceny or any felony. An illegal entry but without such an intent is not a burglary [citation]; similarly since the 1951 amendment to section 209, kidnapping without intent to rob constitutes kidnapping but not kidnapping for purpose of robbery; and a robbery during a kidnapping where the intent was formed after the asportation is a robbery and not a kidnapping for purpose of robbery.' " (*People v. Tribble*, *supra*, 4 Cal.3d at p. 832; see *People v. Davis*, *supra*, 36 Cal.4th at pp. 565–566.) And the jury was instructed that one element of kidnapping to commit robbery was that "[w]hen th[e] movement began, the defendant already intended to commit []robbery." (See CALCRIM No. 1203.)

6

Paschall first contends that there was not substantial evidence to support that he had the specific intent to commit robbery at the time he and Babers moved Amber from the loading dock after the sexual assaults.

"In addressing a challenge to the sufficiency of the evidence supporting a conviction, the reviewing court must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. (*People v. Reilly* (1970) 3 Cal.3d 421, 425; accord, *People v. Pensinger* (1991) 52 Cal.3d 1210, 1237.) The same standard applies when the conviction rests primarily on circumstantial evidence. (*People v. Perez* (1992) 2 Cal.4th 1117, 1124.) Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. (*Ibid*.) ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. [Citation.]" ' (*People v. Thomas* (1992) 2 Cal.4th 489, 514.)" (*People v. Kraft* (2000) 23 Cal.4th 978, 1053–1054.)

### Substantial Evidence Supports That Paschall Intended to Rob Amber Before the Kidnapping Began

Amber testified that Paschall and Babers had taken her driver's license, and that once the attacks concluded, they told her "if you tell anybody

about this we'll go after the people at this address." Her testimony continued as follows:

"Q. Did you think that you were going to be left there and that they were done, that your experience was almost done?

"A. No, far from it. So after that little speech about the ID, they decided we should walk specifically back to the little plaza area in between the quad and City Hall.

"And there like I think first Babers goes on about how he was like molested, assaulted by aunties in his family, so now it was my turn.

"[Proceedings interrupted by court reporter.]

"MR. TALAI [prosecutor]: Q. You said 'crazy rationalization.'

"A. Of the experience he had, as far as this happened to me. All that shit. And now it's your turn.

"And then after the confrontation there was talking with each other, should they kill me, what should they do with me.

"Q. I'm sorry, let me stop you.

"Who was it that decided that you're going to go with them and walk?

"A. Him [indicating].

"Q. I see you pointing to him. Are you referring to the defendant in court right now?

"A. Yes."

After showing Amber a photograph of the jeans she was wearing on the night of the incident, the prosecutor's questioning continued as follows:

"MR. TALAI: Q. Now, as you and the defendant and Mr. Babers are now walking, are you walking in these pants that are shown in People's 8?

"A. Yeah.

"Q.     And so you're walking around with—let me ask it this way:  Is the shirt you were wearing, was that wet?

"A.     Yeah, the white t-shirt.

"Q.     And the pants that you were wearing had vomit on them?

"A.     Yes.

"Q.     So you're walking with these two men in clothing that is either wet or has vomit on it?

"A.     Well, wet because of my shirt and the alcohol, and then the lovely combination of barf on my pants.

"Q.     And they are having a conversation about what they should do with you.  Specifically the defendant said 'we should kill' or 'should we kill her,' something to that effect?

"While you are walking with these two men where were they in relation to you as you're walking around?

"A.     Very close, like walking together.

"Q.     Is one of them always on one side of you or not?

"A.     I feel like the defendant was probably more on my right side, but I can't remember exactly them walking on either side.  Once we were walking I'm like, fuck, I need to get away from these guys.

"[Proceedings interrupted by court reporter.]

"THE WITNESS:       Are they going to keep me like they said.

"MR. TALAI:       Q.     At some point in time did either the defendant or Mr. Babers decide what to do, where to go?

"A.     Yes,  the defendant said to keep me, keep me walking with him.

"And then he decided that we were going to go to the ATM machine and pull money out of my account.

"MR. WISE [defense counsel]: I'll object, speculation, move to strike as far as what they decided.

"THE COURT: Motion to strike is granted.

"Ask a different question.

"When I strike an answer please disregard it as I indicated earlier.

"MR. TALAI: That's great. I would like to make it more specific.

"Q. It's important, Amber, that we figure out which one of these men decided to take you to an ATM.

"THE COURT: The objection is to the word 'decided.' You can ask her what they said.

"MR. TALAI: Q. Which one of them indicated to you let's go to an ATM?

"A. The defendant.

"Q. And once the defendant said let's go to an ATM, is that what you, he and Kenneth Babers next did?

"A. Yes.

[Objection overruled.]

"MR. TALAI: Q. Once the defendant indicated to you that you're going to go to an ATM, what happened next?

"A. We started walking. I chose a Wells Fargo that I knew was closed."

Later, during cross-examination, defense counsel questioned Amber regarding her California driver's license and referred her to the transcript of her grand jury testimony:

"Q. And on the page, page 27, in reference to your testimony earlier that you thought the shorter man had your card, starting on line 16, the question was:

*"Where did they get your cards from?*

*"Your answer:     From where I [inaudible] or something.  My cards were in the pocket.  I don't carry a wallet.*

*"Q.     They went through your pockets?*

*"A.     Yeah.*

*"Q.     Who had your cards, do you know?*

*"A.     The taller one.*

*"And the taller one is the one you identified as Mr. Babers; is that correct?*

*"A.     Yes."*

As noted, Paschall moved for a new trial, arguing that there was insufficient evidence to support the element of the requisite intent on the kidnapping for robbery charge.  Judge Ross denied the motion, observing in part as quoted above that:  "With regard to the kidnapping, the evidence is clear that upon . . . first attacking her, the defendants obtained various ATM cards.  And when they finished their sexual assault, then used the ATM cards to transport her to the banks whose ATMs could be accessed by use of those cards—clearly, circumstantial evidence to support each of the prerequisites of 1203 CALCRIM and the charge for which Mr. Paschall was convicted in Count 12."

We agree, and conclude that viewed in the light most favorable to the judgment, there is substantial evidence to support the jury's conclusion that Paschall had the requisite intent to commit robbery at the time the kidnapping began.

As Judge Ross noted, Amber's grand jury testimony showed that defendants had Amber's "cards," which the jury could infer must have included the ATM card she later used to attempt to withdraw money at the

11

Wells Fargo ATM. Amber also testified that just after defendants threatened to "go after" the people at the address on her driver's license, Paschall "decided we should walk specifically back to the little plaza area in between the quad and City Hall," close to where the Wells Fargo ATM was located.[3] And when asked "what happened next" "[o]nce the defendant indicated to you that you're going to go to an ATM," Amber answered "[w]e started walking." From this evidence, the jury could permissibly conclude that Paschall had the specific intent to rob Amber at the time the movement from the loading dock began.

As Paschall asserts, other parts of Amber's testimony suggest that defendants were undecided about what to do with Amber even after they had started walking, and that the decision was not made to go to an ATM until after the movement had begun. However, it was for the jury to resolve any inconsistencies in Amber's testimony and to find the facts, and in considering whether substantial evidence supports their verdict, we disregard any evidence supporting a contrary conclusion. (See *People v. Aguilar* (2019) 41 Cal.App.5th 1023, 1026 [when reviewing jury verdict for substantial evidence we "accept all evidence supporting the judgment, disregard contrary evidence, and draw reasonable inferences in favor of the verdict"].) Put slightly differently, " 'if the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding.' " (*People v. Brown* (2014) 59 Cal.4th 86, 106.) Reversal is required only if " 'it appears "that upon no hypothesis whatever is there sufficient substantial

---

[3] Amber later explained: "Since we were in the quad area of City Hall, right next to the library, which was across from the quad area, there's a Wells Fargo Bank branch that has a teller right across from the library. And the other teller is on Market Street. So we started on the one closest to us."

12

evidence to support [the conviction.]" ' " (*People v. Cravens* (2012) 53 Cal.4th 500, 508, citations omitted.)

### Substantial Evidence Supports That the Movement Increased the Risk of Harm

Paschall also argues that a second element of kidnapping for robbery was not supported by substantial evidence, the requirement that "the movement must have increased the risk of harm to the person beyond that necessarily present in the robbery." (CALCRIM No. 1203; see § 209, subd. (b)(2) ["This subdivision shall only apply if the movement of the victim is beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in, the intended underlying offense"].) Paschall argues that because he and Babers moved Amber from the loading dock to a more public place, the only reasonable inference the jury could draw from the evidence is that the movement decreased Amber's risk of harm.

In determining whether the movement increased the victim's risk of harm, the jury should consider " ' "such factors as the decreased likelihood of detection, the danger inherent in a victim's foreseeable attempts to escape, and the attacker's enhanced opportunity to commit additional crimes. [Citations.] The fact that these dangers do not in fact materialize does not, of course, mean that the risk of harm was not increased." ' " (*People v. Vines* (2011) 51 Cal.4th 830, 870.) In *People v. Nguyen* (2000) 22 Cal.4th 872, the defendant forced the victim from her house at gunpoint, drove her to a bank and forced her to withdraw money, and then drove her to a convenience store, then to a remote wooden area, and then to a second bank. (*Id*. at pp. 874–876.) Along the way, the defendant told the victim to drink juice she feared was drugged, and threatened to kill her. (*Id*. at p. 875.) Our Supreme Court

13

concluded that the increased risk of harm requirement could be "satisfied by a substantially increased risk of either physical or mental harm," because "substantial movement of a victim, by force or fear, which poses a substantial increase in the risk of psychological trauma to the victim beyond that to be expected from a stationary robbery, seems an entirely legitimate basis for finding a separate offense." (*Id.* at p. 886.)

These principles, we conclude, demonstrate that substantial evidence supports an increased risk of harm in this case.

First, the fact that Amber was moved from the loading dock to more public streets does not categorically mean that the jury could not conclude that the increased risk of harm element was satisfied, because the test for that element does not obey "rigid" rules. As the court put it in *People v. James* (2007) 148 Cal.App.4th 446, 456, "There is no rigid 'indoor-outdoor' rule by which moving a victim inside the premises in which he is found is never sufficient asportation for kidnapping for robbery while moving a victim from inside to outside (or the reverse) is always sufficient." Rather, whether the movement entails an increased risk of harm in a particular case "will necessarily depend on the particular facts and context of the case," and "must be considered in the context of the totality of its circumstances." (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1152–1153.)

Second, Amber's testimony undermines Paschall's claim that the movement decreased the risk of harm simply because Amber was taken to a more public place. Amber testified that there were not "a lot of people out and about," that it was still dark out, and that after she withdrew money she and the defendants headed down Market Street toward Sixth Street, which "felt like an unsafe area"; it was, she described, "a street where people cop drugs and a lot of people smoke crack." Amber unsuccessfully tried to "signal

14

with [her] eyes" to a passerby to get help, and concluded that "it [did not] seem like anybody in the environment could help me."

Finally, substantial evidence supports that the movement increased Amber's risk of harm because the movement increased Amber's risk of psychological harm. Amber testified that Paschall and Babers threatened to "go after" the people at the address on her driver's license, "repeatedly threatened [her] life," "made very clear that if I did not cooperate [Paschall] would kill me," told her that Babers had a gun, and as the movement was ongoing, debated whether or not they should kill her in her presence. Later on, they decided that Amber's "name was going to be changed, and [she] was going to be used for sex."

Indeed, Amber's testimony provides substantial evidence from which the jury could conclude that "[t]he movement not only increased the *risk* of harm to [Amber], but it also caused additional harm *in fact*." (*People v. Simmons* (2015) 233 Cal.App.4th 1458, 1472.) After hearing Paschall and Babers discuss whether to kill Amber or use her for sex, Amber was "very scared," "felt like my life as my own was over," "didn't know if I would ever see my friends or family again," and "didn't know what my future would look like outside of potentially more unwanted brutal sex with them or other people." Some of the psychological harm in fact also lasted beyond the incident, as Amber testified that while she used to love going on long walks, "[i]t was definitely a long time [after the incident] before I would walk around at night."

Given all this context, substantial evidence supports the conclusion that the movement substantially increased the risk of psychological harm to Amber "beyond that to be expected from a stationary robbery." (*People v. Nguyen, supra*, 22 Cal.4th at p. 886.)

15

**The Trial Court Did Not Abuse Its Discretion in Refusing to Permit Defense Counsel to Cross-Examine Amber Regarding Mental or Emotional Disorders**

Paschall argues that the trial court violated his rights under the confrontation clause by refusing to permit his counsel to cross-examine Amber about whether she had a mental or emotional disorder that may have affected her ability to perceive or recall the incident.

By way of additional background, at one point during Amber's testimony, the court reporter interrupted the proceedings, telling the court: "Judge, I'm having a really hard time understanding. We may need to get another reporter in here." The reporter's transcript shows that at six other times during Amber's testimony the proceedings were interrupted by the court reporter. And although the reasons for those interruptions do not appear in the record, after the last of these interruptions, Judge Ross said: "I understand that some people may be having difficulty hearing or understand[ing] what the witness is saying. [¶] Anybody have any difficulty? The court reporter and I have some difficulty, so I'm going to ask you to speak as distinctly as you can. [¶] If you do have any problem with any witness or at any time, please raise your hand and we'll address the issue."

During a break in Amber's cross-examination, outside the presence of the jury, Judge Ross noted that defense counsel had "indicated that they wanted to ask [Amber] whether she had any mental health issues at the time of this event in January of 2002." A hearing was held on the request, at which defense counsel indicated he had "previously subpoenaed any psychiatric records from S.F. General for Ms.—for Amber S. and received nothing." But, defense counsel explained, his current request was based on "seeing [Amber's] demeanor and how she spoke during her examination

16

yesterday," including her "very rushed" manner of speaking, her "flat affect, which from my experience can suggest sometimes a symptom of mental disorder," and the fact that "[s]ome of her comments seemed somewhat tangential."

After the parties presented argument, Judge Ross denied the request with this lengthy—and thoughtful—explanation:

"[Amber] testified yesterday and I observed her throughout her testimony, and I found her testimony to be extraordinarily clear, competent, remarkably calm in light of the fact that she was testifying about having been sodomized, orally penetrated, anally penetrated, vaginally penetrated many times by two men at the same time and yet her demeanor was calm and collected. I saw no evidence in her testimony of any mental health issues either now or any indication that she had any at that time. Her description of her life and her circumstances when she was 20 years old in January of 2002 was completely consistent with that of a normal healthy person. So there was nothing that I observed which would have given rise to a new and unanticipated issue that couldn't have been raised before. [¶] . . . [¶]

"So I weighed the question which the defense wanted to ask of Amber, gave consideration, of course, as Mr. Wise has argued to the defendant's confrontation clause rights protected by the Federal and State Constitution rights. I also conducted [an Evidence Code section] 352 analysis.

"Here, first, there was nothing disclosed by Amber during her two days of testimony that suggested any mental health issues.

"Second, to simply ask those questions of someone who had already been victimized, at least by Mr. Babers, who testified to having raped her, . . . sodomized her and forced her to perform oral sex upon him, she's been victimized by one defendant who I sentenced to state prison for 21 years, to

17

force her in front of a jury of 18 people to answer mental health questions where there was no evidence whatsoever in the discovery or in her testimony yesterday to suggest that, in my view would have violated her constitutional rights under article 1, Section 1 and article 1, Section 28 of the California Constitution.[4]

"Again, also under Evidence Code [section] 352 I weighed any possible probative value of that question as against the possibility of prejudice to the People and to the victim and concluded in that balance, given what I had observed with regard to her demeanor, her thoughtful and considered answer to all of the questions by both the People and the defense under the most excruciating circumstances one could imagine, I struck that balance in favor of denying the request to ask those questions where there was no evidence that there was anything other than a fishing [expedition] and possibly in an effort to intimidate her in front of the jury, which would have in my view violated her constitutional rights and was not required by California or Federal constitutional law.

"For those reasons the request was denied."[5]

---

[4] Article I, section 28, subdivision (b)(1) of the California Constitution provides victims of a crime the right to "be treated with fairness and respect for his or her privacy and dignity, and to be free from intimidation, harassment, and abuse, throughout the criminal or juvenile justice process." And article 1, section 28, subdivision (b)(4) provides the right to "prevent the disclosure of confidential information or records to the defendant, the defendant's attorney, or any other person acting on behalf of the defendant, which could be used to locate or harass the victim or the victim's family or which disclose confidential communications made in the course of medical or counseling treatment, or which are otherwise privileged or confidential by law."

[5] Our observation about Judge Ross's explanation in support of his ruling leads us to comment on the exemplary way he handled this case. It is refreshing indeed to review an appeal in a case such as this—lengthy, highly

Later, Sally Holland, a physician's assistant who examined Amber after the incident, testified that during her examination Amber "had rapid speech, which indicated to me a level of trauma, that she was talking very quickly." On cross-examination, defense counsel asked Holland about a report on which she had written "rapid speech" under the heading "neurological":

"Q.    So what if Amber S. always spoke that way even before this incident happened?  What would that indicate to you?

"And I'm asking you because you put it down in the neurological section.

"A.    That's where it would be because neurological—it could also be in the psychological speech.  Could be under psychiatry as well.

"It's possible in my experience in this type of work and in my experience as a clinician for more than 20 years one can identify rapid speech as being part of perhaps something else that's going on.

"Q.    Something neurological?

"A.    More psychiatric than neurological.

"Q.    And I think you noted elsewhere, and I can show you in the transcript if need be, that this is not a typical finding, rapid speech, it's significant?

"A.    It is an indicator that someone is trying to get something out without bearing a lot of emotion or with—or being able to speak and get the information out without having to really feel what's going on.

---

charged, and vigorously contested—and read an appellant's brief that asserts one claim of error by the trial court.  There is no claim of error in jury selection, in evidentiary rulings, in the handling of witnesses, in jury instructions, in responding to questions from jurors, in post-trial motions, in sentencing.  Nothing.  Judge Ross's performance here is to be commended. And we commend it.

"Q.     And if that's not—if somebody speaks that way, say, before a traumatic incident happens or trauma is not an issue and they still speak that way, I think you said it could be an indication of something else going on?

"A.     Uh-huh.

"Q.     Such as?

"A.     There are very few people who speak rapidly, very rapidly.  And that may be who they are and part of their make up.

"Q.     I understand that, but I think when you're saying something psychiatric or neurological, I was asking you on that level not just—

"A.     I guess I'm not sure what you're trying to ask me.

"Q.     Is that a symptom of something, potentially?

"A.     Potentially, my—because she was alert and cooperative and coherent and she was talking very rapidly, I believed that was significant.

"Q.     Understood.  And did you consider whether that was, since you noted it and I see that you didn't—on this form that I keep talking about, you didn't write 'rapid speech due to trauma'?

"A.     Of course not.  I wouldn't—this is an objective finding.  That would be the assessment or the plan.  So this is just documenting an objective finding.

"Q.     Okay.  So you didn't really—your job was not to consider whether her rapid speech was a symptom of some other kind of disorder or psychiatric issue she had?

"A.     Right, it was just an objective finding."

Later, defense counsel sought to cross-examine Holland regarding whether she "observed any mental health symptoms."  Judge Ross denied the request:  "The defense request is denied.  Not only for all the reasons that I

20

stated previously, but I listened to and observed the testimony of Ms. Holland. And when you sought to raise an issue with regard to Amber's mental health, Ms. Holland was steadfast in saying that to the extent she observed rapid speech she attributed it to the trauma and stress of the rape that Amber had just been subjected to. [¶] While she certainly stated from her resume and her experience that she is in a position to identify symptoms of mental health issues, she didn't identify any with regard to Amber. So I don't think the factual predicate has changed whatsoever from when I denied the previous defense request pursuant to California Constitution article 1, Section 28."

Finally, after the jury returned its verdict, Paschall moved for a new trial on this same ground. Judge Ross denied the motion. First, he held that in order to properly raise the issue, defense counsel should have alerted the court to it before the jury was dismissed, "at which time the court could have and would have allowed [an Evidence Code section] 402 hearing on that limited issue without subjecting Amber S. to that questioning in front of the jury to determine whether there was any predicate upon which to cross-examine her in front of the jury on any mental illness issues."

Second, he found that "contrary to defense counsel's allegations in the motion, that Amber S. was not difficult to understand, that she did not have a halting, digressive and rapid pattern of testimony, that the statements with regard to what Nurse Hollins [*sic*] observed immediately after the events . . . do not in any way provide a factual predicate for an indication of mental health issues that goes to her ability to perceive, remember, describe events about which she was testifying." Indeed, he went on, it was "[q]uite the contrary": "[t]he court found then and the court recalls now and reiterates that her demeanor was remarkably appropriate, calm, and evidence of a

21

person who had gone through an extraordinarily traumatic event yet perceived clearly and remembered it well, notwithstanding 16, 17 years had elapsed between the time of events to the time of her testimony . . . ."

"The Confrontation Clause of the Sixth Amendment gives the accused the right 'to be confronted with the witnesses against him.' This has long been read as securing an adequate opportunity to cross-examine adverse witnesses." (*United States v. Owens* (1988) 484 U.S. 554, 557.) Nevertheless, a trial court may "impose reasonable limits on counsel's inquiry," and "the court's 'limitation on cross-examination . . . does not violate the confrontation clause unless a reasonable jury might have received a significantly different impression of the witness's credibility had the excluded cross-examination been permitted.' " (*People v. Williams* (2016) 1 Cal.5th 1166, 1192.)

It is true that "the mental illness or emotional instability of a witness can be relevant on the issue of credibility, and a witness may be cross-examined on that subject, if such illness affects the witness's ability to perceive, recall or describe the events in question. (*People v. Herring* (1993) 20 Cal.App.4th 1066, 1072; *People v. Anderson* (2001) 25 Cal.4th 543, 608 (conc. opn. of Kennard, J.).)" (*People v. Gurule* (2002) 28 Cal.4th 557, 591–592.) And although a trial court is expected to allow cross-examination on any factor " 'which could reasonably lead the witness to present less than reliable testimony,' " when dealing with questioning designed to impeach a witness, "[t]he constitutional right to confront and cross-examine adverse witnesses does not include the right to ask wholly speculative questions ungrounded in factual predicate even when posed in the quest to discredit a witness." (*People v. Schilling* (1987) 188 Cal.App.3d 1021, 1032–1033.)

When a confrontation clause claim is premised on the trial court's restriction of the scope of cross-examination, we review for an abuse of

discretion. (*People v. Peoples* (2016) 62 Cal.4th 718, 765.) And we find none, as there was no such factual predicate here, nothing to support the conclusion that Amber had any mental health issues, never mind issues that could have "affect[ed] [her] ability to perceive, recall or describe the events in question." (*People v. Gurule*, *supra*, 28 Cal.4th at p. 592.)

Although the court reporter interrupted Amber's testimony several times, the record does not explain why those interruptions took place. As indicated, the record in places suggests that the reason may have simply been that Amber was soft-spoken, with Amber at one point stating "I want to make sure the jury can hear me. I talk softly," and Judge Ross later observing that, "I think the court reporter may be having trouble hearing and distinguishing your words. If you could speak louder and more clearly." Certainly there is nothing in the record to suggest that the way Amber spoke was indicative of any sort of mental or psychological disorder.

Moreover, as defense counsel acknowledged, there was no evidence produced in discovery—including in response to a defense subpoena to San Francisco General Hospital for Amber's medical records—that Amber had ever had any such disorder. And with respect to Holland's testimony, she ultimately clarified that although she wrote "rapid speech" under the heading "neurological," that was simply an "objective finding" about the way that Amber spoke and not intended as any diagnosis or opinion about any kind of disorder. Finally, Judge Ross was able to observe Amber and listen to her testimony, and repeatedly disagreed with defense counsel's assertion that there was anything about her testimony that was abnormal or indicative of any kind of disorder. Under these circumstances, Judge Ross did not abuse his discretion in concluding that there was no factual predicate to cross-

23

examine Amber regarding whether she had a mental or psychological disorder at the time of the incident.

## DISPOSITION

The judgment is affirmed.

_____
Richman, Acting P. J.

WE CONCUR:


_____
Stewart, J.


_____
Miller, J.


A155545

25